IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | |
|---|---|
| HARDWIRE, LLC,<br><br>     Plaintiff,<br><br>v.<br><br>IRVIN EBAUGH, IV,<br><br>INFRASTRUCTURE ARMOR LLC,<br><br>FREYSSINET INTERNATIONAL ET CIE,<br><br>and<br><br>FREYSSINET, INC.,<br><br>     Defendants. | Civil Action No. 1:20-CV-00304 (JKB) |

**DEFENDANT FREYSSINET, INC.'S
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

KILPATRICK TOWNSEND & STOCKTON LLP
Clay C. Wheeler (*pro hac vice* pending)
Chad D. Hansen (*pro hac vice* pending)
Reuben C. Goetzl (D. Md. Bar No. 21638)
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
cwheeler@kilpatricktownsend.com
chadhansen@kilpatricktownsend.com
rgoetzl@kilpatricktownsend.com
Telephone:919-420-1700
Facsimile: 919-420-1800

*Attorneys for Defendant Freyssinet, Inc.*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

PROCEDURAL HISTORY..................................................................................................5

FACTUAL BACKGROUND .................................................................................................6

    I.     Plaintiff and its Alleged Trade Secrets .................................................................6

    II.    The IA Defendants and Their Purported Wrongful Conduct.................................6

    III.   Freyssinet USA ......................................................................................................8

    IV.   The K-Bridge Project .............................................................................................8

    V.    Plaintiff Is "Extremely Concerned" and Goes to the FBI....................................10

    VI.   The Alleged Wrongdoing of Freyssinet USA .......................................................11

ARGUMENT .........................................................................................................................11

    I.     Each of Plaintiff's Seven Claims Against Freyssinet USA Should Be
          Dismissed Under Rule 12(b)(6) for Failure to State a Claim Upon
          Which Relief Can Be Granted ...............................................................................11

          A.    Legal Standards for a Motion to Dismiss Under Rule 12(b)(6)................11

          B.    Plaintiff Fails to State a RICO Claim Against Freyssinet USA................12

                 1.    Legal standards for civil RICO claims..........................................12

                 2.    Plaintiff fails to allege a "pattern of racketeering
                        activity"...........................................................................................13

                 3.    Plaintiff's RICO claim against Freyssinet USA is
                        nothing more than a repurposed state-law tort claim....................16

          C.    Each of Plaintiff's Claims Against Freyssinet USA Is Barred
               by the Applicable Statutes of Limitations...................................................17

                 1.    Plaintiff's federal law claims are time-barred..............................18

                 2.    Plaintiff's state law claims are time-barred .................................21

          D.    In Addition to Being Time-Barred, Plaintiff's Claims for
               Trade-Secret Misappropriation Under the DTSA and
               Maryland Law Fail Rule 12(b)(6) Because the DTSA Does
               Not Apply Retroactively, Plaintiff Has Failed to Sufficiently

Identify the Trade Secrets at Issue, and Plaintiff's Key
Assertion Regarding Trade-Secret Misappropriation Lacks
Plausibility ..................................................................................22

1.  Legal standards for federal and state trade-secret
    misappropriation .......................................................22

2.  Plaintiff's DTSA claim against Freyssinet USA must
    be dismissed because the DTSA does not apply to
    alleged misappropriation that took place before May
    11, 2016......................................................................22

3.  Plaintiff fails to sufficiently identify the trade secrets it
    claims Freyssinet USA misappropriated........................24

4.  Plaintiff's key factual assertion – that the K-Bridge bid
    proposals Plaintiff submitted to the Freyssinet
    Defendants contained trade secrets, and that those bid
    proposals were passed on to Ebaugh –
    lacks plausibility .......................................................25

E.  In Addition to Being Time-Barred, Plaintiff's Sherman
    Antitrust Act Claims Fail Rule 12(b)(6) Because Plaintiff
    Does Not Include Sufficient Factual Allegations Concerning
    Antitrust Injury or a "Dangerous Probability" of Acquiring
    Monopoly Power Over a Relevant Market ................................27

F.  Plaintiff's State-Law Fraud and Conspiracy Claims Fail Under
    Rule 12(b)(6) for Additional Reasons........................................29

II.  Plaintiff's First Amended Complaint Against Freyssinet USA Should
     Be Dismissed Under Rule 12(b)(2) for Lack of Personal Jurisdiction .................30

A.  Maryland's Long-Arm Statute Does Not Provide for
    Jurisdiction Over Freyssinet USA ...........................................31

B.  The 14th Amendment Does Not Permit Jurisdiction Over
    Freyssinet USA ........................................................................32

CONCLUSION....................................................................................................34

## TABLE OF AUTHORITIES

**Cases**

*7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*,
  2015 WL 1514539, (S.D.N.Y. Mar. 31, 2015),
  *aff'd*, 771 F. App'x 498 (2d Cir. 2019) ................................................................................ 17

*Adams v. NVR Homes, Inc.*,
  193 F.R.D. 243 (D. Md. 2000) ............................................................................................. 29

*Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*,
  483 U.S. 143 (1987) .............................................................................................................. 15

*Aphena Pharma Sols.-Md. LLC v. BioZone Labs., Inc.*,
  912 F. Supp. 2d 309 (D. Md. 2012) ................................................................................ 31, 32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ....................................................................................................... passim

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) .............................................................................................................. 28

*Attia v. Google*,
  983 F.3d 420 (9th Cir. 2020) ............................................................................................... 14

*Bassoff v. Treanor, Pope & Hughes P.A.*,
  2015 WL 8757651 (D. Md. 2015) ....................................................................................... 29

*Bausch v. Philatelic Leasing, Ltd.*,
  34 F.3d 1066 (4th Cir. 1994) ................................................................................... 17, 19, 22

*Becker v. Noe*,
  2019 WL 1415483 (D. Md. 2019) ................................................................................. passim

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ....................................................................................................... passim

*Berringer v. Steele*,
  133 Md. App. 442 (Md. Ct. App. 2000) .............................................................................. 21

*Bindagraphics, Inc. v. Fox Grp., Inc.*,
  377 F. Supp. 3d 565 (D. Md. 2019) ..................................................................................... 24

*Bond v. Messerman*,
  391 Md. 706 (2006) .............................................................................................................. 32

*Brown v. Am. Broad. Co.*,
  704 F.2d 1296 (4th Cir. 1983) ............................................................................................. 17

*Brumbaugh v. Princeton* Partners,
   985 F.2d 157 (4th Cir. 1993) ................................................................. 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977) ............................................................................. 27

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ............................................................................. 33

*Camick v. Holladay*,
   858 F. App'x. 640 (10th Cir. 2018) ........................................................ 24

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
   334 F.3d 390 (4th Cir. 2003) ........................................................... 30, 33

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
   561 F.3d 273 (4th Cir. 2009) ................................................................. 34

*Deiter v. Microsoft Corp.*,
   436 F.3d 461 (4th Cir. 2006) ................................................................. 27

*Detrick v. Panalpina, Inc.*,
   108 F.3d 529 (9th Cir. 1997) ................................................................. 18

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ................................................................. 28

*Dual Inc. v. Lockheed Martin Corp.*,
   857 A.2d 1095 (Md. Ct. App. 2004) ....................................................... 21

*Fare Deals Ltd. v. World Choice Travel.Com, Inc.*,
   180 F. Supp. 2d 678 (D. Md. 2001) ........................................................ 30

*GE Investment Private Placement Partners II v. Parker*,
   247 F.3d 543 (4th Cir. 2001) ........................................................... 15, 16

*GO Comput., Inc. v. Microsoft*,
   508 F.3d 170 (4th Cir. 2007) ................................................................. 21

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   429 U.S. 229 (1989) ............................................................................. 15

*Holmes v. Parade Place, LLC*,
   2013 WL 5405541 (S.D.N.Y. 2013) ........................................................ 17

*Manikhi v. Mass Transit Admin.*,
   360 Md. 333 n.6 (Md. Ct. App. 2000) ..................................................... 30

*Mathon v. Marine Midland Bank, N.A.*,
  875 F. Supp. 986 (E.D.N.Y. 1995) ......................................................................... 12

*Menasco, Inc. v. Wasserman*,
  886 F.2d 681 (4th Cir. 1989) ................................................................................ 15

*MPC Containment Sys.,  Ltd. v. Moreland*,
  2008 WL 2875007 (N.D. Ill. 2008) ....................................................................... 25

*Oscar v. Univ. Students Co-Op. Assoc.*,
  965 F.2d 783 (9th Cir. 1992)
  *abrogated on other grounds* by *Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005).......................... 12

*Pandit v. Pandit*,
  808 F. App'x 179 (4th Cir. 2020) .......................................................................... 31

*Perdue Foods LLC v. BRF S.A.*,
  814 F.3d 185 (4th Cir. 2016) ................................................................................ 33

*Perdue Holdings, Inc. v. BRF S.A.*,
  45 F. Supp. 3d 514 (D. Md. 2014) ......................................................................... 31

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
  828 F.2d 211 (4th Cir. 1987) ................................................................................ 18

*Poffenberger v. Risser*,
  431 A.2d 677 (Md. 1981) ...................................................................................... 22

*Resnick v. City of Troy*,
  2019 WL 2092567 (M.D. Ala. 2019) ..................................................................... 24

*Resolute Forest Prods., Inc. v. Greenpeace Int'l*,
  302 F. Supp. 3d 1005 (N.D. Cal. 2017) ................................................................ 30

*Robert L. Kroenlein Tr. v. Kirchhefer*,
  764 F.3d 1268 (10th Cir. 2014) ............................................................................ 18

*Rotella v. Wood*,
  528 U.S. 549 (2000).............................................................................................. 17

*Sedima, S.P.R.L. v. Imrex Co.*,
  473 U.S. 479 (1985).............................................................................................. 13

*Snowden v. Lexmark Int'l, Inc.*,
  237 F.3d 620 (6th Cir. 2001) ................................................................................ 14

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993).............................................................................................. 28

*Therapearl, LLC v. Rapid Aid Ltd.*,
  2014 WL 4794905 (D. Md. 2014) ........................................................ 28

*Top Agent Network, Inc. v. Zillow, Inc.*,
  2015 WL 7709655 (N.D. Cal. 2015) ..................................................... 25

*Wis. Elec. Power Co. v. Pub. Serv. Comm'n of Wis.*,
  316 N.W. 2d 120 (Wis. Ct. App. 1981) ................................................ 26

*Woods v. Stewart Title Guar. Co.*,
  2006 WL 2135518 (D. Md. 2006) ........................................................ 30

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
  401 U.S. 321 (1971) ............................................................................ 21

*Zinz v. Evans & Mitchell Indus.*,
  22 Md. App. 126 (1974) ....................................................................... 32

**Statutes**

15 U.S.C. § 15b ........................................................................................... 21

18 U.S.C. § 1832 ......................................................................................... 13

18 U.S.C. § 1836 ......................................................................................... 22

18 U.S.C. § 1836(d) ..................................................................................... 19

18 U.S.C. § 1839(5) ..................................................................................... 22

18 U.S.C. § 1961(1) ..................................................................................... 13

18 U.S.C. § 1961(4) ..................................................................................... 13

18 U.S.C. § 1961(5) ..................................................................................... 13

18 U.S.C. § 1962(c) ..................................................................................... 12

Md. Code Ann. Com. Law § 11-1207 ..................................................... 5, 13

Md. Code Ann., Com. Law § 11-1201(c) ................................................... 22

Md. Code Ann., Com. Law § 11-1206 ........................................................ 21

Md. Code Ann., Cts. & Jud. Proc. § 5-101 ................................................ 21

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) ........................................... 31

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(3) ....................................... 31

Restatement of Torts § 757
    (October 2020 Update) ......................................................................................... 26

**Rules & Regulations**

Fed. R. Civ. P. 12(b)(2) ................................................................................. 3, 30, 34

Fed. R. Civ. P. 12(b)(6) ............................................................................... passim

Fed. R. Civ. P. 9(b) ..................................................................................... 4, 29, 30

**Other Authorities**

Defend Trade Secrets Act of 2016,
    Pub. L. No. 114-153, § 2(e), 130 Stat. 376, 381-82 ............................... 14, 15, 22, 23

Defendant Freyssinet, Inc. ("Freyssinet USA") submits the following memorandum of law in support of its Motion to Dismiss Plaintiff's First Amended Complaint.

## INTRODUCTION

This lawsuit began in early 2020 as a relatively straightforward (albeit aged) dispute between an employer and its former employee concerning the employer's trade-secret and otherwise confidential information. The employer, plaintiff Hardwire, LLC, filed a federal complaint in this Court alleging that its former employee, defendant Irvin Ebaugh, IV, stole thousands of electronic files from Plaintiff in early 2013 after Ebaugh learned he was being terminated. According to Plaintiff, Ebaugh also returned to Plaintiff's business at the beginning of 2015 and took photographs of Plaintiff's technology. In its original complaint ("Original Complaint"), Plaintiff asserted that Ebaugh established a rival company, defendant Infrastructure Armor LLC, and used the information he had stolen from Plaintiff to compete against Plaintiff, including winning the contract to manufacture and install cable shielding for the Kosciuszko Bridge or "K-Bridge" construction in New York City.

After ten months of litigation against Ebaugh and Infrastructure Armor (together, "IA Defendants"), Plaintiff amended its complaint to add as defendants Freyssinet USA and Freyssinet International et Cie ("Freyssinet Int'l") (together, "Freyssinet Defendants").[1] The Freyssinet Defendants are involved in the business of bridge construction and repair, including the manufacturing and installation of multi-strand "stay cables" used for certain bridges. As alleged in Plaintiff's First Amended Complaint ("FAC"), approximately nine years ago they began discussions with Plaintiff concerning the possibility of collaborating based on their complementary

---

[1] Freyssinet Int'l has not yet been served in this case. As a result, this motion is brought by Freyssinet USA only.

products, but Plaintiff then partnered with another stay-cable supplier, and the Freyssinet Defendants awarded the K-Bridge cable-protection work to Infrastructure Armor.

Four of the seven claims in the FAC against Freyssinet USA are brought under federal statutes: the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Defend Trade Secrets Act of 2016 ("DTSA"); and the Sherman Antitrust Act. The remaining three claims against Freyssinet USA are brought under Maryland law for trade secret misappropriation, fraud, and civil conspiracy.

It is important to note that, when Plaintiff amended the Original Complaint against its former employee Ebaugh by adding allegations concerning the Freyssinet Defendants, Plaintiff did <u>not</u> include any specific allegation that Ebaugh or Infrastructure Armor had given stolen trade secrets belonging to Plaintiff to either of the Freyssinet Defendants.[2] Instead, the allegations in the FAC directed at the Freyssinet Defendants revolve around a single set of events lasting about one year, from approximately late 2013 to late 2014 – the construction bidding process for the K-Bridge. Plaintiff alleges that, during this process, the Freyssinet Defendants (as potential cable sub-contractors to the general contractor) took three bid proposals Plaintiff had submitted to them (for the cable-protection sub-sub-contract), and shared the "confidential, proprietary, and trade secret" information in them with the IA Defendants. Plaintiff asserts that doing so allowed Infrastructure Armor to "underbid" Plaintiff and win the cable-protection work for the K-Bridge.

There are good reasons to question whether one of Plaintiff's most important factual assertion in the FAC regarding the Freyssinet Defendants – that the K-Bridge cable-protection bid

---

[2] One sentence in the 86-page FAC states, in a conclusory manner and without any specific factual allegations concerning either Freyssinet USA or Freyssinet Int'l, that "Ebaugh and IA transmitted Hardwire's proprietary [information] to third parties, including, without limitation, Freyssinet [and others]." (FAC ¶ 182.) Allegations like this, lacking in any "factual enhancement," are insufficient at the motion to dismiss stage. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 557 (2007)).

proposals Plaintiff submitted to the Freyssinet Defendants contained trade secrets and that the Freyssinet Defendants then passed them on to Ebaugh – is even plausible. Courts have held that the price or other terms of a bid are not protected as trade secrets, and the Restatement of Torts explains that trade secrets must be something more than "information as to a single or ephemeral events in the conduct of the business, as, for example, the amount or other terms" of a contract bid. Furthermore, despite Plaintiff's receipt of thousands of pages of discovery materials from the IA Defendants last year, the FAC does not allege facts supporting the proposition that the Freyssinet Defendants shared any of the written bid proposal documents received from Plaintiff with the IA Defendants. In addition, Plaintiff included specific allegations in its Original Complaint that directly contradict this assertion.

Each of Plaintiff's seven claims against Freyssinet USA in the FAC fails to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). The RICO claim fails because Plaintiff has not alleged anything close to what is required to satisfy RICO's "pattern of racketeering activity" element, in part because Plaintiff relies on the DTSA as the legal basis for its predicate criminal acts while failing to allege Freyssinet USA committed a predicate criminal act after the DTSA's effective date of May 11, 2016, and in part because Plaintiff's allegations concerning a year-long bidding process for a construction project do not constitute the type of long-term and continuous conduct RICO was designed to eradicate.

If the Court determines that Plaintiff's RICO claim against Freyssinet USA must be dismissed, it should then apply its traditional approach to assessing specific personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and find that personal jurisdiction over Freyssinet USA is lacking. Neither Maryland's "long-arm" statute nor the due process requirements of the

Fourteenth Amendment authorize personal jurisdiction over Freyssinet USA, a Virginia corporation which is not alleged to have committed any acts in Maryland.

Furthermore, each of Plaintiff's claims against Freyssinet USA is barred by the applicable three- or four-year statute of limitations. By February or March of 2015, according to the FAC, Plaintiff was so "extremely concerned" about the Freyssinet Defendants' award of the K-Bridge cable-protection work to Infrastructure Armor that Plaintiff went to the FBI. During the bidding process, as Plaintiff alleged in its Original Complaint, Plaintiff also decided to hold back proprietary information from the Freyssinet Defendants after learning that the Freyssinet Defendants were dealing with Ebaugh. These and other circumstances related to the K-Bridge bidding process were more than sufficient to start the running of the applicable statutes of limitations, which then ran out no later than early 2019. Unlike the IA Defendants, neither Freyssinet USA nor Freyssinet Int'l entered into a tolling agreement with Plaintiff.

Plaintiff's claims under the federal DTSA, Sherman Antitrust Act, and Maryland law do not comport with Rule 12(b)(6) for important additional reasons. The DTSA only applies to the "acquisition . . . disclosure or use" of another's trade secret on or after the DTSA's effective date of May 11, 2016, and Plaintiff does not sufficiently allege that Freyssinet USA engaged in any of those activities after the K-Bridge bidding process. Also, Plaintiff's trade secret misappropriation claims fail to sufficiently identify the trade secrets Plaintiff alleges were contained in its K-Bridge bid proposals. Furthermore, Plaintiff's Sherman Antitrust Act claims fail under Rule 12(b)(6) because Plaintiff does not adequately allege antitrust injury or a "dangerous probability" of acquiring monopoly power over a plausible relevant market, both fundamental components of Sherman Act claims. And finally, Plaintiff's state-law claims for fraud and civil conspiracy should be dismissed because Plaintiff fails to meet the heightened Rule 9(b) pleading standard.

-4-

## PROCEDURAL HISTORY

The Original Complaint was filed by Plaintiff Hardwire on February 4, 2020. (D.E. 1.) Plaintiff alleged nine counts against the IA Defendants. (*Id.*) Neither Freyssinet USA nor Freyssinet Int'l was made a defendant by Plaintiff at that time. (*Id.*) In June 2020, the IA Defendants filed a motion to dismiss, contending that several common law claims asserted by Plaintiff against them were preempted by the Maryland Uniform Trade Secrets Act, Md. Code Ann. Com. Law § 11-1207. (D.E. 22.) Following the Court's denial of the IA Defendants' motion to dismiss (D.E. 26), the case proceeded to discovery. (D.E. 34; D.E. 37.)

On December 15, 2020, Plaintiff moved to amend its Original Complaint to add additional claims and to join the Freyssinet Defendants as additional defendants.[3] (D.E. 38.) Plaintiff's motion, which was unopposed, was granted by the Court on December 18, 2020. (D.E. 39.) The FAC alleges eleven counts against Ebaugh and/or Infrastructure Armor, eight counts against Freyssinet Int'l, and seven counts against Freyssinet USA.[4] (D.E. 40.)

Freyssinet USA was served with the FAC in Sterling, Virginia on December 29, 2020. Plaintiff agreed to extend by 30 days Freyssinet USA's deadline to respond to the FAC, making the response due on February 19, 2021.

---

[3] Defendant Freyssinet Int'l, based in France, is a separate and distinct company from Freyssinet USA. (FAC ¶¶ 4-5.) As noted earlier, to date, Freyssinet Int'l has not been served with the summons and FAC. This Motion to Dismiss is brought only on behalf of Freyssinet USA.

[4] The facts and purported wrongful conduct that Plaintiff alleges against the IA Defendants in the FAC are largely the same as those alleged in the Original Complaint. (*Id.*) What is new in the FAC are additional legal claims against the IA Defendants, and the addition of new allegations and claims directed at the Freyssinet Defendants.

## FACTUAL BACKGROUND[5]

### I.    Plaintiff and its Alleged Trade Secrets

Plaintiff Hardwire, a Delaware limited liability company with its principal place of business in Maryland, specializes in the development of protective armor for a wide variety of public uses, including "military and law enforcement vehicles, boats, and aircraft, body armor for United States warfighters and law enforcement personnel, and protective materials for public facilities, schools, and courthouses." (FAC ¶¶ 1, 31-33.) Plaintiff maintains more than 20 patents, but most of its purportedly proprietary information constitutes "trade secrets that derive independent economic value from not being generally known or readily ascertainable through proper means, rendering the patent process an ineffective means of protection." (FAC ¶¶ 38-39.) These alleged trade secrets include "armor recipes and technology, information about test devices and testing methodology, threat information, manufacturing processes, pricing models, and subcontractor information." (FAC ¶ 40.) This case concerns Plaintiff's bridge security solutions, which are designed to reinforce bridges against a range of accidents and terrorist attacks. (FAC ¶¶ 34-35.) Plaintiff contends that its bridge security solutions were "the first of their kind," leading Plaintiff to be the frequent recipient of "sole-source contracts for bridge security without the need for competitive procurement." (FAC ¶ 36-37.)

### II.    The IA Defendants and Their Purported Wrongful Conduct

Ebaugh was employed by Plaintiff starting in 2002. (FAC ¶ 48.) Beginning in late 2012 and early 2013, "Ebaugh's attitude and demeanor changed and darkened dramatically." (FAC ¶ 13.) He began to exhibit aggressive and arrogant behaviors toward other Hardwire employees. (FAC ¶ 58.) Ebaugh's attitude became "untenable," which led Hardwire to terminate him from its

---

[5] For purposes of this motion only, Freyssinet sets forth the facts alleged in the FAC.

employment on Monday, February 25, 2013. (FAC ¶¶ 59-60.) Just prior to his termination, however, Ebaugh had requested a thumb drive from Plaintiff's IT manager, partially cleaned out his office, and sent inflammatory e-mails to Plaintiff's CEO. (FAC ¶¶ 14-15.) According to Plaintiff, "[i]mmediately after being informed of his termination, Ebaugh ran to his office" and "grabbed the thumb drive." (FAC ¶¶ 16, 60.) A "tussle ensued" when "Hardwire executives attempted to prevent Ebaugh from taking both the thumb drive and a notebook . . . from the premises." (FAC ¶¶ 17, 61-62.) "Ebaugh broke free with the thumb drive and ran out of the offices." (*Id.*) Plaintiff analyzed Ebaugh's work computer and learned that most of the information on it had been erased. (FAC ¶ 63.)

A week later, counsel for Plaintiff sent Ebaugh a letter "reminding him of his post-employment obligations and restrictive covenants, as well as his obligation not to disclose Hardwire's confidential and proprietary information." (FAC ¶ 65.) In the letter, Plaintiff also "demanded the return of any Hardwire materials that were in Ebaugh's possession." (*Id.*) In mid-March, 2013, a Hardwire employee retrieved the thumb drive from Ebaugh's residence, along with a "security clearance debriefing form" Ebaugh had signed. (FAC ¶ 66.) Plaintiff analyzed the thumb drive upon its return, but contends that Ebaugh had manipulated the drive to make it appear as if it contained no files and little useful information. (FAC ¶ 60.) However, "Hardwire's suspicions began to arise in the weeks and months following Ebaugh's termination." (FAC ¶ 69.)

After being terminated from Hardwire, Ebaugh posted online about a venture of his own. (*Id.* ¶ 76.) This venture became defendant Infrastructure Armor, a Maryland limited liability company with its principal place of business in Maryland. (FAC ¶ 3.) Ebaugh's post about his new venture led Plaintiff, in or around September 2013, to contact bridge contractor Kiewit

Corporation, with whom it believed Ebaugh was working, and advise them of Ebaugh's non-compete obligations to Plaintiff. (FAC ¶ 77.)

## III.    Freyssinet USA

During Ebaugh's employment with Plaintiff, Plaintiff had worked cooperatively with the Freyssinet Defendants. (FAC ¶ 70.) Freyssinet Int'l is a French entity with its principal place of business in France. (FAC ¶ 4.) Freyssinet USA is a Virginia entity with its principal place of business in Virginia. (FAC ¶ 5.) Prior to Ebaugh's termination, Plaintiff had worked with the Freyssinet Defendants, who manufacture bridge cables, to jointly "pitch and bid" bridge construction projects. (FAC ¶ 70.)

In June and July, 2012, respectively, Ebaugh, on behalf of Plaintiff, entered into a Mutual Nondisclosure Agreement ("NDA") and a Memorandum of Understanding ("MOU") with Freyssinet Int'l. (FAC ¶¶ 71, 73, 124.) The purposes of the NDA and MOU were "to help foster the exchange of confidential and proprietary information" between those two parties to advance a long-term collaborative agreement. (FAC ¶ 71.) The NDA and MOU were executed on behalf of Freyssinet Int'l by the Chief Operating Office of Freyssinet USA, who "was acting as the agent and representative of Freyssinet International." (FAC ¶ 74.) After Plaintiff terminated Ebaugh in 2013, however, the Freyssinet Defendants allegedly stopped collaborating with Plaintiff, which led Plaintiff to "partner" with a different bridge cable provider, Structural Technologies. (*Id.* ¶ 78.)

## IV.    The K-Bridge Project

During the latter part of 2013, and in 2014, a bidding process took place for the construction of a replacement for the Kosciuszko Bridge ("K-Bridge") in New York City. (*See, e.g.*, FAC ¶¶ 80, 157, 336.) In May 2014, the New York State Department of Transportation awarded the contract for this project to a design-build team comprised of Skansa AB, Kiewit Corporation, and HNTB Corporation. (*Id.* ¶ 80.) Plaintiff partnered with Structural Technologies to bid on the cable

protection work for the K-Bridge. (FAC ¶ 82.) They bid "through" VSL International, a bridge cable manufacturer and installer. (FAC ¶¶ 78, 82.) In August 2014, this group was told that their price was not competitive. (FAC ¶ 85.)

At or around that time, the Freyssinet Defendants told Plaintiff that they had been awarded the K-Bridge sub-contract. (FAC ¶ 157.) During a meeting between Plaintiff and the Freyssinet Defendants on September 12, 2014, the Freyssinet Defendants told Plaintiff that they had been dealing with Ebaugh, who had entered the infrastructure business. (FAC ¶ 87.) In "late 2014/early 2015," Plaintiff learned that Ebaugh was communicating with Plaintiff's suppliers about using Hardwire's "molds, dies, and designs," and had commissioned "bridge armor qualification testing" from one of Hardwire's subcontractors. (FAC ¶¶ 88-89.) Then, in February or March 2015, Plaintiff learned that the Freyssinet Defendants had awarded the cable armor protection sub-sub-subcontract work to Infrastructure Armor. (FAC ¶ 90.)

During the K-Bridge bidding process, Plaintiff had submitted three proposals to the Freyssinet Defendants through which Plaintiff was willing to provide the cable protection. (FAC ¶¶ 336-37.) The first proposal was submitted in or around December 2013, a second, revised proposal was submitted on or around July 17, 2014, and a third revision was submitted in November 2014, (FAC ¶¶ 141, 336.) The proposals contained confidential and proprietary information concerning Plaintiff's pricing and design specifications. (FAC ¶ 337.) Plaintiff repeatedly alleges that it provided the Freyssinet Defendants with "confidential, proprietary and trade secret information through its proposals for the K Bridge project." (FAC ¶¶ 188, 212; *see also* FAC 217, 251.)

The IA Defendants manufactured and installed armor for the K-Bridge. (FAC ¶ 96.) According to Plaintiff, "[t]he design of the armor used by Ebaugh and [Infrastructure Armor]

incorporates many of the trade secrets owned by Hardwire including, but not limited to armor recipes, attachment methods, installation tooling, and specific design features necessary to defeat the various threats." (*Id.*) Plaintiff contends that the IA Defendants' misuse of its information continued through their work on the first span of the K-Bridge, which was completed in April 2017, (FAC ¶ 97), and the second span, which opened to the public in August 2019. (FAC ¶ 102.)

## V.      Plaintiff Is "Extremely Concerned" and Goes to the FBI

In February or March of 2015, upon learning that the Freyssinet Defendants were using Infrastructure Armor to supply cable protection for the K-Bridge cable protection, Plaintiff became "extremely concerned" and contacted the Federal Bureau of Investigation. (FAC ¶ 91.) Plaintiff reported "the possibility that Ebaugh stole and thereafter misappropriated sensitive materials – including information related to national security infrastructure issues and United States Department of Defense contract information – and was actively using Hardwire's trade secrets and other confidential information." (FAC ¶ 91.) Following Plaintiff's report to law enforcement, a federal criminal investigation began, including a "raid of Ebaugh's home/IA's headquarters" in January 2016. (FAC ¶ 94.) While no criminal charges have apparently been brought, the FBI has determined that Ebaugh "stole more than 27,000 computer files from Hardwire," "trespassed onto Hardwire's private property" to take "photographs of Hardwire's proprietary technology and hardware," and "transmitted and otherwise utilized Hardwire's confidential pricing information, testing costs, and related information to improperly obtain a competitive advantage in the bidding process for the K Bridge job." (FAC ¶ 95.) The criminal investigation is "still ongoing," (FAC ¶ 94), approximately six years after Plaintiff went to the FBI, and eight years after Plaintiff terminated Ebaugh.

## VI.    The Alleged Wrongdoing of Freyssinet USA

According to the FAC, Freyssinet Int'l and Freyssinet USA "fraudulently induced" Plaintiff to provide them with "Hardwire technical data and highly confidential pricing information" in connection with the K-Bridge bidding process, while concealing the existence of the cooperation agreement between Freyssinet Int'l and Infrastructure Armor. (FAC ¶¶ 28, 121, 151.) Plaintiff alleges that the Freyssinet Defendants then illegally passed this Hardwire data and information on to the IA Defendants, in violation of the NDA between Freyssinet Int'l and Plaintiff, allowing Infrastructure Armor to "underbid" Plaintiff. (FAC ¶ 152.)

## <u>ARGUMENT</u>

## I.    Each of Plaintiff's Seven Claims Against Freyssinet USA Should Be Dismissed Under Rule 12(b)(6) for Failure to State a Claim Upon Which Relief Can Be Granted

### A.    Legal Standards for a Motion to Dismiss Under Rule 12(b)(6)

A civil complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly,* 550 U.S. at 570). Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. An inference of a mere possibility of misconduct is not sufficient to support a plausible claim. *See id.* at 679. As the *Twombly* opinion stated, "[f]actual allegations must be enough to raise a right to relief above the speculative level." 550 U.S. at 555. "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' . . . Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (*quoting Twombly*, 550 U.S. at 555, 557). While, when considering a motion to dismiss, a court must accept as true all factual allegations in the complaint, this

principle does not apply to legal conclusions couched as factual allegations. *See Twombly*, 550 U.S. at 555.

### B.     Plaintiff Fails to State a RICO Claim Against Freyssinet USA

In the FAC, Plaintiff alleges that Freyssinet USA, along with Freyssinet Int'l and the IA Defendants, violated RICO. (FAC ¶¶ 236-56.) However, Plaintiff fails to allege sufficient facts to support this claim.

### 1.     Legal standards for civil RICO claims

When RICO was proposed, its purpose was described as "the elimination of the infiltration of organized crime and racketeering into legitimate organizations . . . ." S. Rep. No. 91-617 at 76 (1969). "RICO was intended to combat organized crime, not to provide a federal cause of action and treble damages to every tort plaintiff." *Oscar v. Univ. Students Co-Op. Assoc.*, 965 F.2d 783, 786 (9th Cir. 1992), *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897 (9th Cir. 2005). In the Fourth Circuit, courts "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Becker v. Noe*, 2019 WL 1415483, *13 (D. Md. 2019) (citations omitted); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1001 (E.D.N.Y. 1995) ("[A]lleged RICO violations must be reviewed with appreciation of the extreme sanctions it provides, so that actions traditionally brought in state courts do not gain access to treble damages and attorneys fees in federal court simply because they are cast in terms of RICO violations.").

Plaintiff brings its RICO claim under 18 U.S.C. § 1962(c), (FAC ¶ 265), which provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

In other words, a RICO plaintiff must prove a defendant's "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "Racketeering activity" is "any act which is indictable" under a number of listed criminal provisions. 18 U.S.C. § 1961(1). A "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of [RICO] and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

### 2.    Plaintiff fails to allege a "pattern of racketeering activity"

Plaintiff fails to sufficiently allege any racketeering activity by Freyssinet USA, and, even if it had, fails to sufficiently allege the "organized, longterm, habitual" pattern required to state a RICO claim.

### a)    Plaintiff's allegations against Freyssinet USA concerning the K-Bridge bidding process do not qualify as RICO predicate acts

Plaintiff relies on the Defend Trade Secrets Act of 2016 to supply the criminal "racketeering activity" or "predicate acts" for Plaintiff's RICO claim. (FAC ¶ 258.) The federal "Theft of trade secrets" felony, 18 U.S.C. § 1832, is included in the long list of RICO predicate acts. *See* 18 U.S.C. § 1961(1). Plaintiff's predicate-act theory is apparently that Freyssinet USA could be criminally indicted for misappropriating trade secrets belonging to Plaintiff by allegedly sharing Plaintiff's K-Bridge bid proposals with the IA Defendants.[6]

---

[6] As noted in the Introduction, and as discussed further below with respect to Plaintiff's claims brought under the DTSA and Maryland's Uniform Trade Secret Act, there are good reasons to question whether Plaintiff's factual assertions in the FAC in this regard are plausible.

Plaintiffs' RICO claim fails to account for the fact that criminal trade secret theft was only added to RICO as a predicate act as of May 11, 2016. *See* Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 2(e), 130 Stat. 376, 381-82. Applying the "anti-retroactivity principle," it is presumed that a criminal law added to RICO as a predicate does not apply to acts before the effective date of the addition, as long as a defendant did not also engage in racketeering activity after the effective date. *See Snowden v. Lexmark Int'l, Inc.*, 237 F.3d 620, 623-25 (6th Cir. 2001); *see also Attia v. Google*, 983 F.3d 420, 424-25 (9th Cir. 2020).

The factual allegations in the FAC concerning Freyssinet USA's activities during the K-Bridge bidding process, and in particular the alleged sharing of Plaintiff's bid proposals by Freyssinet USA, all took place in 2014, well before the effective date of the Defend Trade Secret Act of 2016. As a result, Plaintiff cannot rely on those allegations to establish the predicate acts necessary for its RICO claim.

Plaintiff, most likely recognizing this and all of the other pleading problems with its claims against the Freyssinet Defendants due to the passage of time since the K-Bridge bidding process, has included a handful of vague and conclusory statements in the FAC suggesting that Freyssinet USA is perhaps liable for criminal trade secret theft occurring or continuing after the passage of the DTSA. (*See*, *e.g.*, FAC ¶ 261 ("Freyssinet Defendants . . . caused [Infrastructure Armor] to use Hardwire's trade secrets to complete work on the second span of the K Bridge job, which was completed in August of 2019"); FAC ¶ 263 ("Freyssinet Defendants . . . caused and continue to cause [Infrastructure Armor] to use and disseminate Hardwire's trade secrets, including pricing information, in connection with its efforts to win other bridge armor jobs.")).

Plaintiff's attempts to avoid the anti-retroactivity problem with its RICO claim (not to mention the similar problem with its DTSA claim, or the statute of limitations problems with all

-14-

of its claims) should be rejected. These types of cursory and vague allegations (for example, what does it mean for one company to "cause" another company to use a trade secret?) comprise the kind of "naked assertions" and "labels and conclusions" that the Supreme Court dismissed as insufficient in *Iqbal* and *Twombly*. *See* 556 U.S. at 678. Where Freyssinet USA is concerned, the purported predicate acts alleged by Plaintiff all took place squarely within the K-Bridge bidding process, well before the effective date of the DTSA, and therefore cannot be used to establish the "racketeering activity" element of a RICO claim.

### b)    *Plaintiff's allegations also do not satisfy RICO's pattern requirement*

Plaintiff's RICO claim against Freyssinet USA should also be dismissed because the FAC fails to sufficiently allege a "pattern" of racketeering activity. The pattern requirement is "the heart of any RICO complaint." *Agency Holding Corp. v. Malley-Duff & Assocs. Inc.*, 483 U.S. 143, 154 (1987). That is because "[a] civil RICO action 'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" *Becker*, 2019 WL 1415483, at \*13 (citations omitted.) To prove a pattern of racketeering activity, a plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 429 U.S. 229, 239 (1989).

In making this determination, courts consider factors such as the length of time of the alleged conduct, the number of victims, and the nature of the injury allegedly caused. *See, e.g., Becker*, 2019 WL 1415483, at \*20-21. Courts routinely hold that alleged racketeering activity lasting only a year or two, with a small number of alleged victims, is not the kind of conduct for which RICO is intended. *See id.* (alleged scheme lasting 15 months and involving four victims insufficient to establish RICO pattern); *Menasco, Inc. v. Wasserman*, 886 F.2d 681 (4th Cir. 1989) (alleged scheme lasting a year and involving two victims insufficient); *see also GE Investment*

*Private Placement Partners II v. Parker*, 247 F.3d 543 (4th Cir. 2001) (alleged scheme lasting about two years and involving a single business transaction insufficient).

The FAC is devoid of anything like a "pattern" of racketeering activity by Freyssinet USA. Instead, the allegations are that Freyssinet USA shared a specific set of information purportedly containing trade secrets (Plaintiff's K-Bridge bidding proposals) during a specific business episode (the construction bidding process for the K-Bridge), which took place over approximately one year. As in the *GE Investment* case, this alleged racketeering activity by Freyssinet USA involved a "built-in ending point" – Freyssinet's award of the K-Bridge cable-protection work to Infrastructure Armor. The FAC alleges conduct by Freyssinet USA that is even more bounded and less of a "threat of continued criminal activity" than what is described in the cases cited above, where courts have concluded no RICO pattern existed.

### 3.    Plaintiff's RICO claim against Freyssinet USA is nothing more than a repurposed state-law tort claim

Plaintiff's RICO claim is accompanied by a state-law fraud claim against both Freyssinet USA and Freyssinet Int'l, as well as a breach of contract claim against Freyssinet Int'l. These claims are based on the same allegations against the Freyssinet Defendants as Plaintiff's RICO claim, including the roles played by the NDA between Plaintiff and Freyssinet Int'l, which allegedly covered the K-Bridge bid proposals Plaintiff submitted to the Freyssinet Defendants, and the cooperation agreement between Infrastructure Armor and Freyssinet Int'l, which allegedly mandated without exception that the Freyssinet Defendants use Infrastructure Armor as their exclusive supplier of cable protection.

In comparing the similarities between Plaintiff's allegations in support of its RICO claim (as well as Plaintiff's other claims under federal law) and Plaintiff's state-law tort and contract claims, and considering how far short Plaintiff's RICO claim falls in terms of the elements

required, it is apparent that Plaintiff is attempting to use RICO (as well as Plaintiff's other federal law claims) to disguise a state-law dispute as a federal one. This is yet another reason why Plaintiff's RICO claim should be dismissed. *See Holmes v. Parade Place, LLC*, 2013 WL 5405541, at *14 (S.D.N.Y. 2013) (given the "powerful incentive for plaintiffs to attempt to fit garden variety fraud claims within the standard of civil RICO" due to "the allure of treble damages, attorney's fees, and federal jurisdiction," courts must "scrutinize civil RICO claims early in the litigation to separate the rare complaint that actually states a claim for civil RICO from that more obviously alleging common law fraud").[7]

### C.    Each of Plaintiff's Claims Against Freyssinet USA Is Barred by the Applicable Statutes of Limitations

Statutes of limitations serve the "basic policies of . . . repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella v. Wood*, 528 U.S. 549, 555 (2000). The court may determine the accrual date for a cause of action at the motion to dismiss stage "if the facts presented provide a 'clear basis' for such a determination." *Bausch v. Philatelic Leasing, Ltd.*, 34 F.3d 1066, at *4 (4th Cir. 1994) (*quoting Brown v. Am. Broad. Co.*, 704 F.2d 1296, 1304 (4th Cir. 1983)).

---

[7] For the reasons set forth in this sub-section I.B, Plaintiff's RICO claim against Freyssinet USA is not colorable, *i.e.*, it is wholly immaterial and insubstantial. *See Becker*, 2019 WL 1415483, at *17. Plaintiff's RICO claim is also not colorable because, as argued below in sub-section I.C, it is barred by the statute of limitations. *See 7 W. 57th St. Realty Co., LLC v. Citigroup, Inc.*, 2015 WL 1514539, at *7 n.2 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 771 F. App'x 498 (2d Cir. 2019). Thus, Plaintiff cannot rely on RICO's relaxed standards of personal jurisdiction to establish jurisdiction over Freyssinet USA. *See id.*; *Becker*, 2019 WL 1415483, at *17.

Similarly, should the Court determine that Plaintiff's RICO claim is colorable, but nonetheless fails to satisfy Rule 12(b)(6), RICO's relaxed standards for personal jurisdiction are moot, and the Court should consider Freyssinet USA's arguments against personal jurisdiction over Plaintiff's other six claims, which appear in Section II below, starting at page 30. *See Becker*, 2019 WL 1415483, at *16-22 (considering and rejecting personal jurisdiction "unrelated to RICO" after dismissing RICO claim under Rule 12(b)(6)).

### 1.    Plaintiff's federal law claims are time-barred

#### a)    *Plaintiff's RICO claim against Freyssinet USA is barred by the applicable statute of limitations*

The statute of limitations for civil RICO claims is four years. *See Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.,* 828 F.2d 211, 220 (4th Cir. 1987). The limitations period for RICO begins to run when a plaintiff "knows or should know" of the injury that underlies its cause of action. *Id.* at 220. This does not require that the plaintiff had known or should have discovered a defendant's racketeering acts, only that the plaintiff had or should have known of its actual injury, for example economic loss. *See Detrick v. Panalpina, Inc.*, 108 F.3d 529, 537-40 (9th Cir. 1997).

Plaintiff alleges that Freyssinet USA shared Plaintiff's bid proposals with Infrastructure Armor so that Infrastructure Armor could "underbid" Plaintiff and "undermine Hardwire's bidding" on the K-Bridge project.[8] (FAC ¶¶ 152, 168-69.) These allegations demonstrate that the actual injury for purposes of Plaintiff's RICO cause of action against Freyssinet USA was the award of the K-Bridge cable-protection work to Infrastructure Armor. *See Robert L. Kroenlein Tr. v. Kirchhefer*, 764 F.3d 1268, 1278-79 (10th Cir. 2014) (in case involving wire fraud, knowledge of accounting losses sufficient to start statute of limitations).

Plaintiff describes how it learned it had lost the K-Bridge cable-protection contract in or around February 2015. (FAC ¶ 90.) It then learned Infrastructure Armor had gotten the work from the Freyssinet Defendants, which made Plaintiff "extremely concerned." (FAC ¶¶ 90, 91.) Plaintiff's next step (in February or March of 2015) confirmed both that the loss of the contract award had injured Plaintiff, and that Plaintiff was fully cognizant of this injury – it went to the Federal Bureau of Investigation. (FAC ¶ ¶ 91, 94.) Because Plaintiff knew of the injury that

---

[8] Plaintiff also alleges that the Freyssinet Defendants somehow used Plaintiff's K-Bridge bid proposals to undermine Plaintiff's bidding on "subsequent projects since that time," (FAC ¶ 168), but provides no details or explanation for this vague assertion.

underlies its RICO cause of action against Freyssinet USA in or around February 2015, Plaintiff was required to bring that claim no later than February 2019.

> **b)** **_Plaintiff's Defend Trade Secrets Act claim against Freyssinet USA is barred by the applicable statute of limitations_**

The statute of limitations for a DTSA claim is three years. *See* 18 U.S.C. § 1836(d). The limitations period for a DTSA claim begins to run from "the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). For the DTSA, a theory of continuing misappropriation does not re-start the running of the limitations period. *See id.*

While the Original Complaint and FAC describe in detail multiple activities by Ebaugh involving the alleged theft of trade secrets and other confidential information belonging to Plaintiff (including the circumstances surrounding Ebaugh's last day of employment with Plaintiff on February 25, 2013), the FAC only contains factual allegations of one understandable theory of trade secret misappropriation by Freyssinet USA – that, during the bidding process in late 2013 and in 2014 for the K-Bridge, Freyssinet USA "disclosed Hardwire's confidential, proprietary, and trade secret information to the IA Defendants." (FAC ¶ 194.) More specifically, Plaintiff alleges that Freyssinet USA took the cable-shielding bid proposals Plaintiff had submitted to the Freyssinet Defendants for the project, which according to Plaintiff contained "Hardwire's pricing, installation and manufacturing methods, testing parameters and locations, and the general scope of services to be provided," (FAC ¶ 141), and provided them to the IA Defendants, (FAC ¶¶ 121, 152.)

The allegations in the FAC demonstrate that, by February 2015 at the latest, Plaintiff knew or should have known that some aspect of its bid proposals provided to the Freyssinet Defendants likely had been obtained by Infrastructure Armor. *See Bausch*, 34 F.3d 1066 at *3

("Commencement of a limitations period need not . . . await the dawn of complete awareness.")

(quoting *Brumbaugh v. Princeton* Partners, 985 F.2d 157, 162 (4th Cir. 1993). Plaintiff was well-aware that the Freyssinet Defendants had aligned themselves with the IA Defendants for purposes of the K-Bridge bidding process, (*see* FAC ¶ 87), just as Plaintiff had aligned itself with its own stay cable "partner" Structural Technologies and bridge cable manufacturer VSL International, competitors of the Freyssinet Defendants'. As a result, Plaintiff and Freyssinet were in competition to a degree. Plaintiff also knew Infrastructure Armor was a new entrant in the market for bridge cable protection, and therefore had little or no information concerning how its bid price would compare with the bid prices of others. Plaintiff also alleges that in February or March 2015 it was "extremely concerned" and reported to the FBI that Ebaugh had obtained and was actively using Plaintiff's trade secrets. (FAC ¶ 91.)

Plaintiff's initial pleading in this case also strongly suggests that Plaintiff knew or should have known that some aspect of its bid proposals provided to the Freyssinet Defendants likely had been obtained by Infrastructure Armor. In its Original Complaint, Plaintiff implicitly acknowledged that it was on guard during 2014 about the possibility that the Freyssinet Defendants had shared and/or would share aspects of Plaintiff's bid proposals with Infrastructure Armor. Specifically, Plaintiff stated that, in 2014, after learning that "Freyssinet" had been awarded the cable protection work for the K-Bridge:[9]

> . . . Freyssinet advised that it had been dealing with Ebaugh, who had entered the infrastructure protection business. Freyssinet requested Hardwire's drawings of its system design. In response to this, Hardwire submitted generic plans and drawings with minimal details and reduced its price again in an attempt to win the job. Despite the existence of a non-disclosure agreement between Hardwire and Freyssinet, Hardwire did not provide detailed proprietary information regarding its armor recipe or integration methods.

---

[9] Plaintiff removed all but the first sentence of these allegations once it named Freyssinet USA and Freyssinet Int'l as defendants in the FAC. (*Compare* FAC ¶ 87.)

(Original Complaint ¶ 71.) All of these factors, including many aspects of the K-Bridge bidding process drawn from Plaintiff's own allegations, support the conclusion that, by early 2015, Plaintiff knew or should have known that some aspect of its bid proposals provided to the Freyssinet Defendants likely had been obtained by Infrastructure Armor. That was almost six years before Plaintiff filed its claims against Freyssinet USA.

c)    *Plaintiff's Sherman Antitrust Act claims against Freyssinet USA are barred by the applicable statute of limitations*

The statute of limitations for a Sherman Antitrust Act claim is four years. *See* 15 U.S.C. § 15b. The limitations period begins to run when an act was committed that "injures a plaintiff's business." *GO Comput., Inc. v. Microsoft*, 508 F.3d 170, 173 (4th Cir. 2007) (*quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971)). Plaintiff's only plausible and non-conclusory allegations in the FAC concerning acts by Freyssinet USA involve the K-Bridge bidding process. (*See, e.g.*, FAC ¶ 152.) Because all alleged acts by Freyssinet USA in connection with the bidding process for the K-Bridge occurred in late 2013 and in 2014, the statute of limitations for Plaintiff's Sherman Antitrust Act claims against Freyssinet USA expired by the end of 2018, approximately two years before Plaintiff filed its claims.

**2.    Plaintiff's state law claims are time-barred**

Plaintiff's state law claims against Freyssinet USA carry a three-year statute of limitations. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101. This limitations period begins to run when the alleged claim is discovered or should have been discovered. *See* Md. Code Ann., Com. Law § 11-1206; *Berringer v. Steele*, 133 Md. App. 442, 493 (Md. Ct. App. 2000); *Dual Inc. v. Lockheed Martin Corp.*, 857 A.2d 1095, 1104 (Md. Ct. App. 2004). Under this Maryland "discovery rule," the statute of limitations begins to run with:

> [A]ctual knowledge—that is express cognition, *or* awareness implied from "knowledge of circumstances which ought to have put a person of ordinary

-21-

prudence on inquiry [thus, charging the individual] with notice of all facts which such an investigation would in all probability have disclosed if it had been properly pursued."

*Bausch*, 34 F.3d 1066, at *3 (quoting *Poffenberger v. Risser*, 431 A.2d 677, 681 (Md. 1981).

Because Plaintiff's federal DTSA claim also takes a "discovery" approach to starting the running of the statute of limitations (except without Maryland's emphasis on inquiry notice), the earlier analysis for the DTSA statute of limitations can be applied as well to Plaintiff's state-law claims against Freyssinet USA for trade-secret misappropriation, fraud, and conspiracy. Because the statute of limitations for these claims began by February 2015, the claims were barred by February 2018, almost three years before Plaintiff brought them in this case.

**D.    In Addition to Being Time-Barred, Plaintiff's Claims for Trade-Secret Misappropriation Under the DTSA and Maryland Law Fail Rule 12(b)(6) Because the DTSA Does Not Apply Retroactively, Plaintiff Has Failed to Sufficiently Identify the Trade Secrets at Issue, and Plaintiff's Key Assertion Regarding Trade-Secret Misappropriation Lacks Plausibility**

**1.    Legal standards for federal and state trade-secret misappropriation**

Under the Defend Trade Secret Act of 2016, "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836. "Misappropriation" is categorized by the statute as either an "acquisition of a trade secret of another" or "disclosure or use of a trade secret of another." 18 U.S.C. § 1839(5). The MUTSA also defines misappropriation in this way. *See* Md. Code Ann., Com. Law § 11-1201(c).

**2.    Plaintiff's DTSA claim against Freyssinet USA must be dismissed because the DTSA does not apply to alleged misappropriation that took place before May 11, 2016**

The DTSA was enacted on May 11, 2016. *See* Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, § 3(b), 130 Stat. 376, 382. It applies only to "any misappropriation of a trade secret

. . . for which any act occurs on or after the date of the enactment of [the] Act." 130 Stat. at 381-82.

As discussed previously, Plaintiff's allegations in the FAC concerning alleged trade secret misappropriation by Freyssinet USA concern the Freyssinet Defendants' receipt of three bid proposals from Plaintiff. These bid proposals were provided by Plaintiff to the Freyssinet Defendants "in or around" December 2013, on July 17, 2014, and in November 2014. (FAC ¶¶ 141, 336.) Plaintiff alleges that it "provided Freyssinet Defendants with confidential, proprietary, and trade secret information through its proposals . . ."; *i.e.*, that these proposals contained trade secrets belonging to Plaintiff. (FAC ¶ 188.) Then, according to Plaintiff, the Freyssinet Defendants provided the information received to the IA Defendants. (FAC ¶ 121.) Plaintiff's July 17, 2014 bid proposal was provided to the IA Defendants "so as to allow IA Defendants to steal Hardwire's confidential information and underbid Hardwire." (FAC ¶ 152.) Ultimately, in or around February 2015, Plaintiff learned that the Freyssinet Defendants had given the K-Bridge cable-protection work to Infrastructure Armor and not Plaintiff. (FAC ¶ 90.)

Plaintiff does not sufficiently allege any "acquisition," "disclosure," or "use" of a trade secret by Freyssinet USA once the K-Bridge bidding process in 2013 and 2014 ended.[10] Because the DTSA cannot be applied retroactively to events that took place well over a year before it was

---

[10] As discussed in sub-section I.B above at page 14 concerning Plaintiff's RICO claim, the FAC contains a handful of vague and conclusory statements concerning actions by Freyssinet USA after the passage of the DTSA. As another example, Plaintiff alleges that Freyssinet Defendants "have utilized, and are continuing to utilize, Hardwire's confidential and proprietary information in connection with the K Bridge project and other construction projects around the country." (FAC ¶ 254.) Aside from the fact that this allegation does not refer to any trade secret, it does not include any of the factual enhancement required to buttress this sweeping allegation. *See Iqbal*, 556 U.S. at 678.

enacted, Plaintiff's DTSA claim should be dismissed. *See Camick v. Holladay*, 858 F. App'x. 640, 644-45 (10th Cir. 2018); *Resnick v. City of Troy*, 2019 WL 2092567, at *6 (M.D. Ala. 2019).

### 3.    Plaintiff fails to sufficiently identify the trade secrets it claims Freyssinet USA misappropriated

Plaintiff fails to state a claim for trade-secret misappropriation by Freyssinet USA under either the DTSA or Maryland law because the FAC lacks sufficient facts identifying the trade secrets at issue. In order to proceed past the motion to dismiss stage, Plaintiff must allege enough facts so that the Court can determine what the trade secrets are. *See Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 577 (D. Md. 2019) (dismissing Maryland trade-secret claim because "the complaint is not clear enough as to what [the] trade secret . . . is").

Plaintiff alleges that the bid proposals it provided to the Freyssinet Defendants for the K-Bridge project contained "trade secret information." (FAC ¶ 188.) Plaintiff also alleges that its July 17, 2014 bid proposal to the Freyssinet Defendants contained "Hardwire's *pricing, installation and manufacturing methods, testing parameters and locations, and the general scope of services to be provided*." (FAC ¶ 141 (emphasis added).) In addition, "[e]ach of [Plaintiff's K-Bridge] proposals to [the Freyssinet Defendants], as well as the numerous meetings and conversations that took place between the parties, contained *confidential and proprietary information concerning Hardwire's pricing and design specifications*." (FAC ¶ 337 (emphasis added).) Plaintiff also alleges that the Freyssinet Defendants "provided [Infrastructure Armor] with Hardwire *technical data and highly confidential pricing information* it received in connection with the K Bridge and other projects." (FAC ¶ 28 (emphasis added).)

These descriptions are insufficient as a matter of law. Plaintiff does not indicate which, if any, of these types of information Plaintiff claims are trade secrets, as opposed to the presumably

much broader category of information that is "confidential and proprietary."[11] *See Top Agent Network, Inc. v. Zillow, Inc.*, 2015 WL 7709655, at *5 (N.D. Cal. 2015) ("[Plaintiff's] failure to distinguish the allegedly shared trade secrets from non-trade secret information renders this claim defective."). Furthermore, even if Freyssinet USA knew which of these types of information are being claimed as trade secrets, the broad descriptions, including "installation and manufacturing methods" and "information concerning . . . design specifications," are insufficient to allow Freyssinet USA and the Court to understand what Plaintiff claims was misappropriated.

### 4. Plaintiff's key factual assertion – that the K-Bridge bid proposals Plaintiff submitted to the Freyssinet Defendants contained trade secrets, and that those bid proposals were passed on to Ebaugh – lacks plausibility

One of the most important factual assertions in the FAC with respect to Plaintiff's claims against Freyssinet USA is that Plaintiff's K-Bridge bid proposals contained trade secrets belonging to Plaintiff, and that the Freyssinet Defendants turned around and provided those bid proposals to the IA Defendants. This fundamental premise of Plaintiff's claim lacks plausibility, and therefore fails to meet the Rule 12(b)(6) standards set by the Supreme Court in *Iqbal* and *Twombly*, for three reasons.

First, courts have held that the price and other terms of a bid by a business do not constitute trade secrets. "[T]he terms of a bid generally are not entitled to trade secret protection." *MPC Containment Sys., Ltd. v. Moreland*, 2008 WL 2875007, at *9 (N.D. Ill. 2008) (citation omitted). This includes the bid price:

---

[11] Elsewhere in the FAC, Plaintiff alleges that its trade secrets include among other things "information about test devices and testing methodology," "manufacturing processes," "pricing models," and "design features." (FAC ¶¶ 40, 95(b).) These alleged trade secrets may or may not be the same information from the bid proposals Plaintiff describes as "testing parameters and locations," "manufacturing methods," "pricing," and "design specifications." (FAC ¶¶ 141, 337.) The Court (and defendant Freyssinet USA) should not have to speculate about what trade secrets Freyssinet USA is accused of misappropriating.

> Not every piece of information created in the ordinary course of business that appellants wish to keep confidential qualifies as a trade secret. Pricing policies, cost markups *or the amount of a company's bid for a particular project*, while ordinarily kept confidential in the business world, are not "trade secrets."

*Wis. Elec. Power Co. v. Pub. Serv. Comm'n of Wis.*, 316 N.W. 2d 120, 123 (Wis. Ct. App. 1981)

(citations omitted, emphasis added). The Restatement of Torts also reaches the same conclusion:

> [A trade secret] differs from other secret information in a business . . . in that it is not simply information as to a single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract . . . . A trade secret is a process or device for continuous use in the operation of the business.

Restatement of Torts § 757 cmt. b (October 2020 Update).

Second, Plaintiff has contradicted the assertion in the FAC that Plaintiff provided trade secrets to the Freyssinet Defendants in connection with the K-Bridge bidding process. In its Original Complaint, Plaintiff alleged facts about how, after hearing from "Freyssinet" that it was dealing with Ebaugh, Plaintiff rebuffed a request for specific design drawings:

> Hardwire submitted generic plans and drawings with minimal details and reduced its price again in an attempt to win the job. Despite the existence of a non-disclosure agreement between Hardwire and Freyssinet, Hardwire did not provide detailed proprietary information regarding its armor recipe or integration methods.

(Original Complaint ¶ 71.)[12]

Third, the FAC's sole allegation that the Freyssinet Defendants provided Ebaugh and/or Infrastructure Armor with one of Plaintiff's written bid proposal documents is conclusory and lacks the required factual enhancement. Plaintiff alleges that the "Freyssinet Defendants provided IA Defendants with a copy of [Hardwire's] July 17 [2014] Proposal," but Plaintiff appears to be making this allegation based solely on an e-mail sent by Ebaugh in which Ebaugh wrote "[Hardwire's] proposal to Freyssinet was clearly inflated substantially and their dialogue with you

---

[12] As noted earlier, Plaintiff removed these allegations once it named Freyssinet USA and Freyssinet Int'l as defendants in the FAC. (*Compare* FAC ¶ 87.)

-26-

not sincere." (FAC ¶ 152.) This may suggest Ebaugh was aware of the dollar figure of Plaintiff's bid, but does not support, much less "prove," as Plaintiff claims, the allegation that Plaintiff's written bid proposal was shared with Ebaugh.

> **E.     In Addition to Being Time-Barred, Plaintiff's Sherman Antitrust Act Claims Fail Rule 12(b)(6) Because Plaintiff Does Not Include Sufficient Factual Allegations Concerning Antitrust Injury or a "Dangerous Probability" of Acquiring Monopoly Power Over a Relevant Market**

In addition to being barred by the applicable statute of limitations, Plaintiff's Sherman Antitrust Act claims fail because the FAC does not adequately allege antitrust injury, which all claims under Sections 1 and 2 of the Sherman Act require. *See Deiter v. Microsoft Corp.*, 436 F.3d 461, 467 (4th Cir. 2006). To prove antitrust injury, a plaintiff must satisfy a two-prong test: (1) the injury is of the type the antitrust laws were intended to prevent; and (2) the injury flows from that which makes the defendant's conduct unlawful. *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). But the only harm Plaintiff alleges is increased competition. (*See, e.g.*, FAC ¶ 301 ("Before Ebaugh and IA began competing with Hardwire, Hardwire was the only company that provided this type of protection for these bridge projects . . . .").) The Supreme Court has made clear that the antitrust laws do not protect competitors from competition, and therefore, that competitors cannot claim increased competition as antitrust injury. *See Brunswick Corp.*, 429 U.S. at 488.

Plaintiff does not plead antitrust injury; rather, it merely pleads that the IA Defendants are more competitive than before. (*See* FAC ¶ 169 ("Defendants have increased their market share at the expense of Hardwire and others in an anticompetitive way.")) Indeed, according to the FAC, Plaintiff complains that Freyssinet USA's conduct has introduced competition into a market that Plaintiff admits to monopolizing. (*See* FAC ¶ 301) ("Before Ebaugh and IA began competing with Hardwire, Hardwire was the only company that provided this type of protection for these bridge

projects and, therefore, Hardwire was awarded sole-source contracts *without the need for competitive procurement.")* (emphasis added), ¶ 370 ("[T]he IA Exclusivity Agreement and the arrangement established with Defendants was intended to propel IA into the market space, which has barriers to entry and for which Hardwire *was the exclusive supplier* providing retrofit solutions.") (emphasis added).) Because Hardwire does not adequately allege antitrust injury, Hardwire's Sherman Antitrust Act claims against Freyssinet USA must be dismissed. *See, e.g.*, *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior."); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) ("Because [Plaintiff] has failed to allege facts which, if true, would establish that the two licensing agreements at issue are unreasonable restraints on trade that caused antitrust injury to consumers, its § 1 and § 2 claims fail as a matter of law.").

Plaintiff's Sherman Act Section 2 claim that the Freyssinet Defendants attempted to monopolize "the armor shielding and bridge cable market" separately fails because Plaintiff does not plead any allegations sufficient to show a "dangerous probability" of obtaining monopoly power, as it must to maintain an attempted monopoly claim. *See Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). In fact, Plaintiff's allegations show that it, not Freyssinet, has monopoly power.

Hardwire alleges with conclusory language that Defendants "undertook certain conduct with the intent to monopolize the armor shielding and bridge cable market." (FAC ¶ 376) Plaintiff never alleges a market share attributable to Freyssinet USA nor does it make any specific allegations supporting a conclusion that Freyssinet USA has monopoly power. *See Therapearl, LLC v. Rapid Aid Ltd.*, 2014 WL 4794905, at *8 n.10 (D. Md. 2014). Moreover, Plaintiff freely

admits that before the entry by Infrastructure Armor and the Freyssinet Defendants, it was the sole provider in the market, and monopolized it. It is not plausible that the conduct Hardwire complains of would be sufficient to give Freyssinet a "dangerous probability" of going from an "essentially nonexistent" market share, (FAC ¶ 123), to replacing an entrenched monopolist.

### F.    Plaintiff's State-Law Fraud and Conspiracy Claims Fail Under Rule 12(b)(6) for Additional Reasons

In addition to being time-barred, Plaintiff's fraud claim against Freyssinet USA must be dismissed because Plaintiff does not sufficiently plead with particularity the facts supporting the claim under Rule 9(b). *See, e.g.*, *Adams v. NVR Homes, Inc.*, 193 F.R.D. 243, 249-50 (D. Md. 2000). Plaintiff attempts to allege an ongoing "fraudulent scheme" by making broad-brush assertions about alleged meetings, conversations, and representations between the Freyssinet Defendants and Plaintiff. (*See, e.g.,* FAC ¶¶ 334, 336, 337, 340(b), 340(c), 343.)

Plaintiff has not met 9(b)'s heightened pleading requirements because Plaintiff does not describe the "time, place, speaker, [or] contents" of those alleged meetings, conversations, or representations. *See, e.g.*, *Bassoff v. Treanor, Pope & Hughes P.A.*, 2015 WL 8757651, at *8 (D. Md. 2015) ("As [Plaintiff] utterly fails to plead particularized facts, such as the time, place, and contents of any false representations, his allegations concerning fraud fail to meet the particularity requirements of Rule 9(b)."). The fraud allegations also do not distinguish between the "Freyssinet Defendants" in any way, and therefore, do not meet 9(b)'s particularity requirements. *See Adams*, 193 F.R.D. at 250 ("A complaint fails to meet the particularity requirements of Rule 9(b) when a plaintiff asserts merely conclusory allegations of fraud against multiple defendants without identifying each individual defendant's participation in the alleged

fraud."). Plaintiff's fraud claim against Freyssinet USA should be dismissed for failure to comply with Rule 9(b)'s particularity requirements.[13]

Because "civil conspiracy" is not an independent cause of action in Maryland, Plaintiff's civil conspiracy claim must be dismissed for the same reasons that the other state-law claims should be dismissed. *See Fare Deals Ltd. v. World Choice Travel.Com, Inc.*, 180 F. Supp. 2d 678, 692 (D. Md. 2001) ("Because [Plaintiff] has failed to demonstrate any liability of [Defendant] for a substantive tort, its claim of civil conspiracy has no merit and must also be dismissed."). Indeed, it is unclear whether under Maryland law Plaintiff can even bring a separate civil conspiracy claim in this case. *See Woods v. Stewart Title Guar. Co.*, 2006 WL 2135518, at *4 (D. Md. 2006) ("As explicitly stated by the Maryland Court of Appeals, it is 'improper pleading to allege . . . conspiracy in [a] separate count.'") (alteration in original) (quoting *Manikhi v. Mass Transit Admin.*, 360 Md. 333, 360 n.6 (Md. Ct. App. 2000)).

## II.    Plaintiff's First Amended Complaint Against Freyssinet USA Should Be Dismissed Under Rule 12(b)(2) for Lack of Personal Jurisdiction

"[F]or a district court to assert personal jurisdiction over a nonresident defendant, two conditions must be satisfied: (1) the exercise of jurisdiction must be authorized under the state's long-arm statute; and (2) the exercise of jurisdiction must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Because the Court's exercise of jurisdiction over Freyssinet

---

[13] Indeed, courts have held that all claims based on allegations of fraud must meet Rule 9(b)'s heightened pleading requirements. *See, e.g.*, *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1022 (N.D. Cal. 2017) ("Rule 9(b)'s heightened pleading requirements apply even where fraud 'is not a necessary element of a claim,' but the plaintiff chooses 'nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct,' including 'a unified course of fraudulent conduct.'") (citation omitted)). Therefore, all of Plaintiff's claims alleging that the Freyssinet Defendants "fraudulently induced" Hardwire to turn over its alleged trade secrets must be pled with particularity, including its trade-secret and antitrust claims.

USA is neither authorized by Maryland's long-arm statute nor comports with due process requirements, Plaintiff's claims against Freyssinet USA should be dismissed.

### A.    Maryland's Long-Arm Statute Does Not Provide for Jurisdiction Over Freyssinet USA

Maryland courts have consistently held that Maryland's long-arm statute is coextensive with the limits of personal jurisdiction established under the due process clause of the Fourteenth Amendment. *See Perdue Holdings, Inc. v. BRF S.A.*, 45 F. Supp. 3d 514, 516 (D. Md. 2014). For that reason, typically the statutory inquiry merges with the constitutional examination. *See id.* However, where a plaintiff has not pled facts sufficient to satisfy the Maryland long-arm statute, no constitutional inquiry is necessary. *See Becker*, 2019 WL 1415483, at *26. Here, none of the allegations involving Freyssinet USA meet any of the thresholds listed in Maryland's long-arm statute. *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b). Therefore, the Court lacks personal jurisdiction over Freyssinet USA.

Plaintiff alleges that this Court has personal jurisdiction over Freyssinet USA because Freyssinet USA's "actions caused injury to Hardwire within the State of Maryland." (FAC ¶ 9.) Presumably, Plaintiff contends there is personal jurisdiction under subsection (b)(3) of Maryland's statute, which provides for jurisdiction over someone who "cause[d] tortious injury in [Maryland] by an act or omission in [Maryland]." *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(3).

For that section to apply, however, the alleged wrongful act must have occurred *in* Maryland; that a Maryland resident or corporation was injured by the alleged wrongful conduct is not enough. *See, e.g.*, *Pandit v. Pandit*, 808 F. App'x 179, 186 (4th Cir. 2020) ("[W]e conclude that Appellant has not made a prima facie showing that the Arkansas Defendants' conduct falls under the scope of § 6-103(b)(3) because he has not alleged that they wrote or sent the purportedly defamatory emails and letters while they were in Maryland."); *Aphena Pharma Sols.-Md. LLC v.*

*BioZone Labs., Inc.*, 912 F. Supp. 2d 309, 317 (D. Md. 2012) ("Although the results of [Defendant's] alleged misrepresentations were felt in Maryland, [Plaintiff] has not alleged, nor do the affidavits indicate, that [Defendant] acted in Maryland.").

Here, there are no allegations in the FAC – conclusory or otherwise – that Freyssinet USA acted tortiously in Maryland. Instead, all alleged facts point outside of the state of Maryland. The K-Bridge is located in New York, and Hardwire alleges that it met with Freyssinet USA at Freyssinet USA's Virginia office to discuss Plaintiff's proposal. (FAC ¶ 157.) The FAC contains no allegations of conduct by Freyssinet USA in Maryland.

To the extent Plaintiff alleges that Freyssinet engaged in phone calls or e-mails with Maryland corporations, such as Plaintiff and Infrastructure Armor, such communications do not convey personal jurisdiction. *See*, *e.g.*, *Aphena Pharma Sols.*, 912 F. Supp. 2d at 317 ("The only communications in the record that could give rise to such misrepresentations were phone calls or emails—the types of communications that *Zinz* held were not acts in Maryland.") (citing *Zinz v. Evans & Mitchell Indus.*, 22 Md. App. 126, 130 (1974)). A plain reading of the FAC reveals no facts suggesting "an act or omission in [Maryland]" by Freyssinet USA, which is the only alleged basis for jurisdiction under the Maryland long-arm statute. Thus, personal jurisdiction is lacking, and the Court need not even address the due process standards under the U.S. Constitution.

### B.     The 14th Amendment Does Not Permit Jurisdiction Over Freyssinet USA

Assuming *arguendo* that the FAC contains sufficient facts to satisfy personal jurisdiction under the Maryland long-arm statute, or the Court skips that first step, *see Bond v. Messerman*, 391 Md. 706, 722 (2006) (declining to resolve the long-arm statute analysis because constitutional jurisdiction was lacking), the Court lacks personal jurisdiction over Freyssinet USA because the company has not purposefully availed itself of the laws of Maryland such that it is fair for Freyssinet USA to defend itself here.

"The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit." *Carefirst*, 334 F.3d at 397. As the Fourth Circuit has explained:

> If those contacts form the basis for the suit, they may establish 'specific jurisdiction.' In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiff's claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable." If, however, the defendant's contacts with the state are not also the basis for the suit, then jurisdiction over the defendant must arise from the defendant's general, more persistent, but unrelated contacts with the state. To establish general jurisdiction, the defendant's activities in the state must have been "continuous and systematic."

*Id.* (internal citations omitted). Here, the express allegations of the FAC implicate only specific jurisdiction. (*See* FAC ¶ 9.)

"For a court to have specific personal jurisdiction over a defendant, the defendant must have 'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "Without these minimum contacts, the Court need not wade into a deeper analysis of the second or third prongs" described in *Carefirst. Perdue Holdings*, 45 F. Supp. 3d at 519. In determining whether a defendant has purposely availed itself of the laws of Maryland, courts look to multiple factors, including the following:

- Whether the defendant maintains offices or agents in Maryland;
- Whether the defendant owns property in Maryland;
- Whether the defendant reached into Maryland to solicit or initiate business;
- Whether the defendant deliberately engaged in significant or long-term business activities in Maryland;
- Whether the parties contractually agreed that the law of Maryland would govern disputes;
- Whether the defendant made in-person contact with the resident of the forum in Maryland regarding the business relationship;

-33-

- The nature, quality and extent of the parties' communications about the business being transacted; and
- Whether the performance of contractual duties was to occur within the forum.

*See Becker*, 2019 WL 1415483, at *28 (citing *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)).

Plaintiff does not allege that Freyssinet USA has an office in Maryland or maintains a registered agent in Maryland, that Freyssinet USA owns property in Maryland, or that Freyssinet USA engages in significant or long-term business activities in Maryland. There are no contracts alleged to have been entered into by Freyssinet USA, and therefore no implications about choice of law or forum of performance. Furthermore, there are no allegations that Freyssinet USA undertook any activities in Maryland in furtherance of the alleged misconduct.

## **CONCLUSION**

Plaintiffs fail to state a claim under Rule 12(b)(6), and the Court does not have personal jurisdiction over Freyssinet USA under Rule 12(b)(2). Accordingly, Freyssinet USA respectfully requests that the claims against it in the FAC be dismissed.

Respectfully submitted this 19th day of February, 2021.

By:   /s/ Reuben C. Goetzl
Reuben C. Goetzl (D. Md. Bar No. 21638)
Chad D. Hansen (*pro hac vice* pending)
Clay C. Wheeler (*pro hac vice* pending)
KILPATRICK TOWNSEND &
STOCKTON LLP
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
rgoetzl@kilpatricktownsend.com
chadhansen@kilpatricktownsend.com
cwheeler@kilpatricktownsend.com
Telephone:    919-420-1700
Facsimile:    919-420-1800

*Attorneys for Defendant Freyssinet, Inc.*

-34-

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2021, I filed the foregoing **Defendant Freyssinet, Inc.'s Memorandum of Law in Support of its Motion to Dismiss Plaintiff's First Amended Complaint** using the Court's CM/ECF system, which will automatically send notification of filing to all counsel of record.

/s/ Reuben C. Goetzl
Reuben C. Goetzl
D. Md. Bar No. 21638