## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **HARDWIRE, LLC,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO. JKB-20-0304** |
| **IRVIN EBAUGH IV,** *et al.,* | * | |
| **Defendants** | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

### MEMORANDUM

Hardwire, LLC ("Hardwire") filed suit against Irvin Ebaugh, IV and Infrastructure Armor, LLC ("IA," and collectively with Ebaugh, the "IA Defendants"), alleging violations of federal and state trade secrets laws, the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*, and state common law tort claims. (Compl., ECF No. 1.) Hardwire later amended its Complaint to add Freyssinet, Inc. ("Freyssinet USA") and Freyssinet International Et Cie ("Freyssinet International," and collectively with Freyssinet USA, the "Freyssinet Defendants") as Defendants. (First Am. Compl. ("FAC"), ECF No. 40.) Freyssinet USA filed a Motion to Dismiss Plaintiff's FAC pursuant to Federal Rules of Civil Procedure 12(b)(6), 12(b)(2), and 9(b). (Mot. Dismiss, ECF No. 50; Mot. Dismiss Mem. Supp., ECF No. 51.) In response, Hardwire filed a Cross-Motion for Leave to File a Second Amended Complaint ("SAC"). (Opp'n Mot. Dismiss at 33–35, ECF No. 57.) Both motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons set forth below, Freyssinet USA's Motion to Dismiss the FAC (ECF Nos. 50, 51) will be granted, and Hardwire's Motion for Leave to File a SAC (ECF No. 57) will be denied.

## I.   Background[1]

Hardwire is a technology company that specializes in the development of protective armor for bridges and other public infrastructure. (FAC ¶ 12.) From 2002 until 2013, Ebaugh worked in Hardwire's bridge security division, ultimately serving as Vice President and Program Manager of that division until his termination in February 2013. (*See id.* ¶¶ 13, 15.) As set forth in more detail in this Court's Memorandum of August 27, 2020 (*see* ECF No. 27), Hardwire alleged in its Complaint that upon his termination, Ebaugh stole more than 27,000 electronic files, containing Hardwire's trade secrets and other confidential information. (*See* Compl. ¶¶ 11–13, 43, 111.) Armed with this cache of Hardwire's proprietary armor technology, Hardwire alleged that Ebaugh established IA and misappropriated Hardwire's trade secrets to obtain a multi-million-dollar contract to provide bridge armor for the replacement of the Kosciuszko Bridge (the "K Bridge project") in New York. (*Id.* ¶¶ 16, 21.)

Hardwire explained in its Complaint that it had been unaware of the IA Defendants' alleged misappropriation of its trade secrets and other confidential information in the immediate aftermath of Ebaugh's termination. (*Id.* ¶ 62.) Hardwire was eventually alerted that something was amiss by a sudden cooling of Hardwire's relationship with Freyssinet International—a bridge manufacturer with whom Hardwire had previously collaborated on pitches and projects. (*Id.* ¶ 63.)

Despite Freyssinet International's role in provoking Hardwire's suspicions, however, Hardwire initially brought suit only against the IA Defendants on February 4, 2020. (*See id.*) As a result of information disclosed by the IA Defendants in the course of discovery, Hardwire amended its Complaint on December 18, 2020 and named Freyssinet USA and Freyssinet

---

[1] The facts in this section are taken from the FAC and construed in the light most favorable to the plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

International as additional Defendants under Federal Rule of Civil Procedure 20(a)(2). (*See* ECF Nos. 38, 39.)

In the FAC, Hardwire alleged that discovery produced by the IA Defendants demonstrates that the Freyssinet Defendants, whose presence in the armor market was "essentially nonexistent" before 2014, conspired with the IA Defendants "to steal Hardwire's confidential and proprietary information in the hopes that IA Defendants could recreate Hardwire's product while simultaneously undercutting Hardwire's pricing." (FAC ¶¶ 123, 129.) Hardwire's relationship with the Freyssinet Defendants began in 2012, when the parties entered into a non-disclosure agreement ("NDA") and a Memorandum of Understanding ("MOU"), in which the Freyssinet Defendants pledged not to enter into agreements with other providers of armor technology. (*Id.* ¶ 124.) After Ebaugh's termination, however, the Freyssinet Defendants suddenly stopped responding to Hardwire's communications regarding proposed collaborations and refused to sign a long-term agreement that had been contemplated by the MOU. (*Id.* ¶¶ 124–25.) Although Hardwire noticed the Freyssinet Defendants' unresponsiveness and diminishing interest in formalizing a collaboration agreement, Hardwire alleges that it nonetheless believed at the time that the Freyssinet Defendants would work with Hardwire to bid for the armor work on the K Bridge project and other forthcoming significant construction projects. (*Id.* ¶¶ 125–27.) Accordingly, Hardwire submitted an initial K Bridge project proposal to the Freyssinet Defendants in December 2013 and subsequently updated that proposal in July and November 2014. (*Id.* ¶ 127.)

Instead of seriously considering Hardwire's proposals, however, Hardwire alleges that the Freyssinet Defendants engaged in a conspiracy with the IA Defendants to steal Hardwire's confidential information and use it to under-bid Hardwire for the K Bridge and other projects. (*See*

3

*id.* ¶¶ 128–29.) In 2013 or early 2014, Hardwire alleges that the Freyssinet Defendants approached the IA Defendants to ask whether IA could provide the same bridge armor technology as Hardwire for a lower price. (*Id.* ¶ 131.) In May 2014, unbeknownst to Hardwire, the Freyssinet Defendants and IA entered into a collaboration agreement ("IA Exclusivity Agreement"), which provided that IA would be the exclusive supplier of protective armor for the Freyssinet Defendants' bridge projects. (*Id.* ¶¶ 132–34.)

Despite their commitments under the IA Exclusivity Agreement, however, the Freyssinet Defendants continued to lead Hardwire to believe that they wanted to collaborate on the K Bridge project and induced Hardwire to disclose proprietary information. (*Id.* ¶¶ 135, 139.) Specifically, the Freyssinet Defendants requested a stay cable protection proposal (the "July proposal"), which Hardwire submitted on July 17, 2014, and included "Hardwire's pricing, installation and manufacturing methods, testing parameters and locations, and the general scope of services to be provided." (*Id.* ¶ 141.) Although the July proposal was confidential and subject to the terms of the 2012 NDA, Hardwire alleges that the Freyssinet Defendants shared the July proposal with the IA Defendants, as evidenced by a July 30, 2014 email in which Ebaugh stated that Hardwire's "proposal to Freyssinet was clearly inflated substantially and their dialogue with [the Freyssinet Defendants] was not sincere." (*Id.* ¶¶ 142, 152.) Additionally, after Hardwire submitted its final proposal to the Freyssinet Defendants for the K Bridge project in November 2014, Hardwire avers "[u]pon information and belief, [that] this proposal was also shared with IA Defendants in order to further reduce their 'final proposal' on the K Bridge project." (*Id.* ¶ 159.)

Hardwire further alleges that email correspondence between the Freyssinet Defendants and IA Defendants produced in discovery indicated that the Freyssinet Defendants also shared portions of Hardwire's previous proposal with the IA Defendants and that the Freyssinet Defendants sent

Hardwire's confidential and proprietary information in Microsoft Word format so the IA Defendants "can use [it] as a template and make it easier to cut/paste into [Freyssinet Defendants/IA Defendants] proposal on Friday.'" (*Id.* ¶¶ 145–46.) Freyssinet Defendants also instructed the IA Defendants to "pad the Appendix with enough technical data to give [the contractors for the K Bridge project] confidence that we know what we are doing," which Hardwire construes as a "tacit admission" that the Defendants were stalling for "additional time to steal more of Hardwire's proprietary information and allow IA Defendants to attempt to reproduce the technology at an artificially reduced price." (*Id.* ¶ 148.)

In the fall of 2014, the Freyssinet Defendants advised Hardwire that they had obtained the K Bridge project and that Hardwire remained in consideration for the shielding contract. (*Id.* ¶¶ 157–59.) However, the Freyssinet Defendants began communicating with Hardwire less frequently following the submission of Hardwire's final proposal in November 2014, and ultimately, the Freyssinet Defendants informed Hardwire that it had chosen another company for the shielding work on the K Bridge project in February 2015. (*Id.* ¶ 160.) The Freyssinet Defendants declined to respond to any of Hardwire's inquiries regarding which company was awarded the K Bridge project. (*Id.*)

Hardwire further alleges that later email correspondence reaffirms that the IA Defendants "were receiving Hardwire's confidential and proprietary information throughout the K Bridge project's bidding, and were apparently promised future work by Freyssinet Defendants if they were able to reproduce Hardwire's product at reduced cost." (*Id.* ¶ 165.) First, Hardwire points to a December 5, 2016 email regarding a separate bridge project in which Ebaugh reminded the Freyssinet Defendants that IA's "pricing on the K bridge was 43% lower than Hardwire." (*Id.* ¶

166.) Additionally, on February 24, 2017, Ebaugh advised that his "pricing was good enough to better [Hardwire] by nearly 50% at that time." (*Id.* ¶ 167.)

In the FAC, Hardwire brings claims against the Freyssinet Defendants for violations of the RICO; Defense of Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; the Maryland Uniform Trade Secrets Act, Md. Code Ann. Comm. Law § 11-1201 *et seq.*; fraud; civil conspiracy; and Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2.[2] (*See* FAC.)

Freyssinet USA now moves to dismiss the claims against it in the FAC for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), failure to state a claim under Rule 12(b)(6), and failure to plead with particularity under Rule 9(b) (Mot. Dismiss Mem. Supp.), and Hardwire cross-moves for leave to file a Second Amended Complaint (Opp'n Mot. Dismiss at 33–35).

## II.  *Legal Standards*

Although Freyssinet USA moves to dismiss under Rules 12(b)(2), 12(b)(6), and 9(b) (Mot. Dismiss Mem. Supp.), the Court only sets forth the standards under Rules 12(b)(2) and 12(b)(6) because it does not reach Freyssinet USA's arguments with respect to Rule 9(b).

### A.  *Rule 12(b)(2)*

A motion to dismiss under Rule 12(b)(2) is a test of the Court's personal jurisdiction over the defendant, which "raises an issue for the court to resolve, generally as a preliminary matter." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016).  Where, as here, a court determines personal jurisdiction "on the basis only of motion papers, supporting legal memoranda and the relevant allegations of a complaint, the burden on the plaintiff is simply to make a *prima facie* showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *New*

---

[2] Hardwire also brings a claim for breach of contract against Freyssinet International alone. (*See* FAC ¶¶ 316–32.)

*Wellington Fin. Corp. v. Flagship Resort Dev. Corp.*, 416 F.3d 290, 294 (4th Cir. 2005) (quoting *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989)).  The court must construe the relevant allegations in the light most favorable to the plaintiff and draw "the most favorable inferences for the existence of jurisdiction." *U.S. Sec. & Exch. Comm'n v. Receiver for Rex Ventures Grp.*, 730 F. App'x 133, 137 (4th Cir. 2018) (quoting *Combs*, 886 F.2d at 676).  In drawing its inferences, the court may look outside the plaintiff's proof, to the defendant's motions, legal memoranda and declarations. *Armstrong v. Nat'l Shipping Co. of Saudi Arabia*, Civ. No. ELH-13-3702, 2015 WL 751344, at \*3 (D. Md. Feb. 20, 2015).

### B. Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  An inference of a mere possibility of misconduct is insufficient to support a plausible claim. *Id.* at 679.  Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  "A pleading that offers 'labels and conclusions' or . . . 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557).  Although when considering a motion to dismiss, a court must accept as true all factual allegations in the complaint, this principle does not apply to legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555.

7

### III. Motion to Dismiss the FAC

The Court first analyzes Freyssinet USA's challenges to this Court's personal jurisdiction "because the dismissal of a case on an issue relating to the dispute, such as a failure to state a claim, is improper without resolving threshold issues of jurisdiction, including personal jurisdiction." *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006). Hardwire argues that this Court's jurisdiction over Freyssinet USA is established by RICO's nationwide service of process provision pursuant to Rule 4(k)(1)(C); Maryland's conspiracy theory of personal jurisdiction; and the "100-mile bulge rule" contained in Rule 4(k)(1)(B). (*See* Opp'n Mot. Dismiss at 27–33.)

#### A. Personal Jurisdiction Under RICO

Under Rule 4(k)(1)(C), service of a summons on a defendant establishes personal jurisdiction "when authorized by federal statute." Of relevance here, the civil RICO statute provides that service may be made "on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(d). The Fourth Circuit interprets § 1965(d) to "'authorize nationwide service of process and, thus, the exercise of personal jurisdiction in any district court,' subject to due process considerations under the Fifth Amendment."[3] *Becker v. Noe*, Civ. No. ELH-18-0931, 2019 WL 1415483, at *17 (D. Md. Mar. 27, 2019) (quoting *Swarey v. Desert Capital REIT, Inc.*, Civ. No. DKC-11-3615, 2012 WL 4208057, at *7 (D. Md. Sept. 20, 2012)).

---

[3] There is a circuit split with respect to which provision of § 1965 authorizes nationwide service of process. For example, the Second Circuit relies on § 1965(b) as the source of such authority. *See PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 71–72 (2d Cir. 1998). Section 1965(b) provides that nationwide service of process may occur for any civil RICO action "in which it is shown that *the ends of justice require* that *other parties* residing in any other district be brought before the court." 18 U.S.C. § 1965(b) (emphasis added). Because the Fourth Circuit instead relies on § 1965(d) as the basis for nationwide service of process, courts in the Fourth Circuit dispense with the "ends of justice" analysis. *See, e.g.*, *Sadighi v. Daghighfekr*, 36 F. Supp. 2d 267, 274 (D.S.C. 1999).

A defendant may challenge a court's exercise of personal jurisdiction under RICO's nationwide service of process clause by establishing that the exercise of jurisdiction violates the Fifth Amendment's Due Process Clause or that the RICO claim is not colorable.[4] *See Wallace v. Trost*, Civ. No. DKC-13-3473, 2014 WL 4388389, at *4 (D. Md. Sept. 4, 2014). A RICO claim is not colorable when it is "implausible, insubstantial, or frivolous." *Becker*, 2019 WL 1415483, at *17 (quoting *D'Addario v. Getter*, 264 F. Supp. 2d 367, 388 (E.D. Va. 2003)). Further, the Fourth Circuit has explained that a claim is colorable where it is "arguable and nonfrivolous, whether or not it would succeed on the merits." *Davis v. Featherstone*, 97 F.3d 734, 737–38 (4th Cir. 1996). A defendant carries a heavy burden to demonstrate that a RICO claim is not colorable; indeed, "a claim can be colorable while still failing to satisfy the pleading requirements of the Federal Rules of Civil Procedure." *Swarey*, 2012 WL 4208057, at *8. However, where a court finds that the RICO claim is colorable but deficient under Rule 12(b)(6), "to pursue [] remaining claims, [the plaintiff] must establish a basis for the exercise of personal jurisdiction over defendants, unrelated to RICO." *Becker*, 2019 WL 1415483, at *22; *see also D'Addario*, 264 F. Supp. 2d at 387–88 (explaining that while a colorable federal claim may be used to initially establish pendent *in personam* jurisdiction over the remaining claims, "if the court were to later determine that the federal claim(s) should be dismissed against a defendant, the state claims against that defendant would also have to be dismissed, unless another basis for asserting personal jurisdiction exists").

---

[4] Where a plaintiff invokes a federal statute as the basis for personal jurisdiction, the Due Process Clause of the Fifth Amendment—not the Fourteenth Amendment—applies to protect "the liberty interests of individuals against unfair burden and inconvenience." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997). When a defendant is located in the United States, "it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern." *Id.* at 627 (quoting *Republic of Panama v. BCCI Holdings (Luxembourg), S.A.*, 119 F.3d 935, 947 (11th Cir. 1997)); *see also D'Addario v. Getter*, 264 F. Supp. 2d 367, 387 (E.D. Va. 2003) ("The burden is on the defendant to demonstrate that the assertion of jurisdiction in the forum will make litigation so gravely difficult and inconvenient that he unfairly is at a severe disadvantage in comparison to his opponent.") (internal quotation marks omitted).

Here, Freyssinet USA's Motion to Dismiss contains only a threadbare contention in a footnote that the RICO claim is not colorable because "it is wholly immaterial and insubstantial." (Mot. Dismiss Mem. Supp. at 17 n. 7.) Such conclusory assertion falls short of Freyssinet USA's heavy burden of establishing that that Hardwire's RICO claim is "implausible, insubstantial, or frivolous," *Becker*, 2019 WL 1415483, at *17 (quoting *D'Addario*, 264 F. Supp. 2d at 388), and accordingly, the Court finds that it may properly exercise personal jurisdiction over Hardwire's RICO claim.

In the alternative, Freyssinet USA spills much more ink arguing that Hardwire's RICO claim must be dismissed under Rule 12(b)(6), and as a result, Hardwire may not avail itself of RICO's relaxed personal jurisdiction requirements. (*See* Mot. Dismiss Mem. Supp. at 17 n. 7, 12–19.)  Because Hardwire must identify an independent basis for personal jurisdiction over Freyssinet USA if its RICO claim is dismissed, *see Becker*, 2019 WL 1415483, at *22, the survival of Hardwire's RICO claim under Rule 12(b)(6) is a threshold issue for the propriety of this Court's exercise of personal jurisdiction over the other claims in the FAC.  Accordingly, the Court considers Freyssinet USA's Rule 12(b)(6) challenges to Hardwire's RICO claim next.

### B. Failure to State a RICO Claim

Freyssinet USA contends that Hardwire fails to plead facts sufficient to state a claim for relief under RICO and that Hardwire's RICO claim is time-barred under the applicable statute of limitations. (*See* Mot. Dismiss Mem. Supp. at 12–19.)  Because the Court agrees that Hardwire has failed to plead the requisite elements of a RICO claim, it will not consider Freyssinet USA's arguments with respect to the statute of limitations.

The RICO statute prohibits the conduct of an "enterprise's affairs through a pattern of racketeering activity."  18 U.S.C. § 1962(c).  Although RICO establishes criminal penalties,

10

Congress also "granted a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions." *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) (citing 18 U.S.C. § 1964(c)).

A civil RICO claim "is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity." *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (citation omitted); *see also Lewis v. Maryland*, Civ. No. PWG-17-1636, 2018 WL 1425977, at \*5 (D. Md. Mar. 22, 2018); *Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 578 (D. Md. 2014). Indeed, a successful plaintiff under the civil RICO statute is entitled to treble damages, costs, and attorney's fees—penalties which the Supreme Court has described as "drastic." *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989); *see also* 18 U.S. § 1964(c). Accordingly, Fourth Circuit precedent does "not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988). Instead, RICO liability is reserved for cases involving "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989) (internal citation and quotation marks omitted). "[B]ecause 'the allure of treble damages, attorney's fees, and federal jurisdiction presents a powerful incentive for plaintiffs to attempt to fit garden variety fraud claims within the standard of civil RICO,' courts have noted that they 'have an obligation to scrutinize civil RICO claims early in the litigation . . .'" *Holmes v. Parade Place, LLC*, Civ. No. GBD-12-6299, 2013 WL 5405541, at \*15 (S.D.N.Y. Sept. 26, 2013) (quoting *Rosenson v. Mordowitz*, Civ. No. JPO-11-6145, 2012 WL 3631308, at \*4–5 (S.D.N.Y. Aug. 23, 2012)).

A plaintiff seeking damages under RICO must plausibly allege four elements to state a claim: (1) conduct [causing injury to business or property], (2) of an enterprise, (3) through a

pattern, (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1995). Freyssinet USA argues that Hardwire has failed to plausibly allege a pattern of racketeering activity under the third and fourth prongs of the RICO analysis.

All civil RICO claims, regardless of the particular statutory violation alleged, must include an allegation of a "pattern of racketeering activity" consisting of at least two related predicate acts that "amount to or pose a threat of continued criminal activity." *H.J.*, 492 U.S. at 240. Acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* (quoting *Sedima*, 473 U.S. at 496 n. 14).

Under the fourth prong, the statutory definition of "racketeering activity" encompasses dozens of criminal violations, including "any act indictable" under 18 U.S.C. §§ 1831, 1832, both of which criminalize the theft of trade secrets. *See* 18 U.S.C. § 1961(1)(B). Of relevance here, § 1832 applies, *inter alia*, to "[w]hoever, with intent to convert a trade secret . . . knowingly—

> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains such information;

> (2) without authorization copies, duplicates, sketches, draws, photographs, downloads, uploads, alters, destroys, photocopies, replicates, transmits, delivers, sends, mails, communicates, or conveys such information;

> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; . . .

> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy[.]

18 U.S.C. § 1832(a). By contrast, § 1836, which is not a RICO predicate, provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action under this subsection if the

12

trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

The criminal trade secrets statute was added as a predicate RICO offense when Congress passed the DTSA on May 11, 2016. *See* DTSA, Pub. L. No. 114-153, 130 Stat. 376. Under the "anti-retroactivity principle," courts generally presume that amendments to RICO do not apply retroactively, unless a defendant continued to engage in the activity after the effective date of the amendment. *See Snowden v. Lexmark Int'l, Inc.*, 237 F.3d 620–23 (6th Cir. 2001).

Hardwire alleges that Freyssinet USA's continued "use and disclosure of [Hardwire's] trade secrets" constitutes a pattern of racketeering activity that began in 2013 and continues to the present day. (Opp'n Mot. Dismiss at 13–15.) Specifically, Hardwire points to: (1) Freyssinet USA's disclosure of Hardwire's trade secrets during the bidding process for the K Bridge project in 2014; (2) the construction of the K Bridge, "where Hardwire's trade secrets were implemented," from 2016 through August 2019; (3) the completion of "the K Bridge armoring project, [during which] Freyssinet Defendants and Ebaugh caused IA to use and disseminate Hardwire's trade secrets"; and (4) the fact that Freyssinet USA "caused, and continue[s] to cause, IA to use and disseminate Hardwire's confidential and proprietary information and trade secrets . . . in connection with its efforts to win other bridge armor jobs." (*Id.* at 13–14; FAC ¶¶ 261–63.) On the other hand, Freyssinet USA contends that Hardwire has failed to allege predicate acts of racketeering activity because Hardwire's post-2016 allegations relate to the use or misappropriation of trade secrets, which may create civil liability under § 1836, but not criminal liability under § 1832.

*ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672 (E.D. Tex. 2020) is instructive. In *ESPOT*, the plaintiff alleged that the defendants worked together to steal the plaintiff's trade

secrets and then incorporated that stolen intellectual property into tablets, which the defendants distributed and marketed to potential customers. *Id.* at 692. The plaintiff contended that "the 'use' of a trade secret is an independent RICO predicate that occurs or will occur each and every time the [defendants] program or ship a tablet, contract with [a plaintiff] advertiser, or service a prospective [plaintiff] customer—and amounts to a regular way of conducting [the defendants'] ongoing business." *Id.* at 694. The court rejected the plaintiff's claim that each alleged use of the plaintiff's trade secrets constituted an independent predicate act for RICO purposes because that interpretation contravenes the plain language of the criminal trade secrets statute. *See id.* at 694. Indeed, § 1832 "does not use the term 'misappropriate' nor the term 'use.' To the contrary, the plain language of the statute appears to invoke the ways in which a person or entity can take or receive a trade secret, not use it once taken." *Id.* at 695. In reaching this conclusion, the court drew a distinction between the civil and criminal provisions of the DTSA, which explicitly provides a private right of action for the misappropriation—meaning, *inter alia*, the disclosure or use—of a trade secret. *Id.* (citing 18 U.S.C. § 1839(5)(B)).

To resist this conclusion, Hardwire relies on *Brand Energy & Infrastructure Services v. Irex Contracting Group* to support its position that each alleged use of its trade secrets constitutes a new instance of racketeering activity. Civ. No. LFS-16-2499, 2017 WL 1105648 (E.D. Pa. Mar. 24, 2017). In that case, the plaintiff alleged that the defendants—ex-employees of the plaintiff company—stole and misappropriated its trade secrets. *Id.* at *1. The court found that the plaintiff company's allegations regarding the defendants' continuing use of its trade secrets alone were sufficient to plead a pattern of racketeering activity under RICO. *Id.* at *12.

The Court finds Hardwire's position untenable. Indeed, as the Northern District of California noted in *Attia v. Google LLC*, "[a]ccepting [Hardwire's] theory would turn a single trade

secret misappropriation claim into a RICO offense every time a defendant violated the DTSA and then did not immediately stop their allegedly unlawful use of the trade secrets." Civ. No. BLF-17-6037, 2018 WL 2971049, at *18 n. 15 (N.D. Cal. June 13, 2018); *see also Mgmt. Comput. Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 883 F.2d 48, 51 (7th Cir. 1989) (finding that the plaintiff's allegation that the defendants copied software and then used it did not "involve[] long-term criminal conduct or activity that could, in commonsense, be called a pattern of racketeering"); *Binary Semantics Ltd. v. Minitab, Inc.*, Civ. No. JFM-07-1750, 2008 WL 763575, at *4 (M.D. Pa. Mar. 20, 2008) (explaining that "the use of trade secrets is quite different from the initial act of stealing them. . . . If plaintiff's complaint were to allege that defendants would continue to steal plaintiff's trade secrets, as opposed to use those which have already been stolen, then there may well be a threat of continuity, but that is not the case here."). The Court is skeptical that Congress intended to furnish all DTSA plaintiffs with the "drastic" remedies afforded to prevailing RICO plaintiffs. *See H.J.*, 492 U.S. at 233.

Here, although Freyssinet USA's alleged initial unauthorized disclosure of Hardwire's bid proposal to the IA Defendants during the K Bridge project bidding process in 2014 falls within the scope of conduct prohibited by § 1832, that act predated the amendment of the RICO statute to include the theft of trade secrets as a predicate act of racketeering activity. All of Hardwire's allegations regarding Freyssinet USA's conduct after the enactment of the DTSA relate to the further *use* of those trade secrets. Although that alleged misappropriation of trade secrets may entitle Hardwire to civil remedies under § 1836, it falls outside the scope of conduct prohibited under § 1832. As such, Hardwire fails to allege any predicate acts of racketeering activity, and accordingly, Hardwire fails to state a claim for relief under RICO in the FAC.

15

### C. Personal Jurisdiction as to the Other Claims in the FAC

As noted above, *see supra* Part III.A, once its RICO claims are dismissed, Hardwire must establish a basis for the exercise of personal jurisdiction over Freyssinet USA unrelated to RICO. The necessity of doing so is a threshold issue for the remaining claims, as it is axiomatic that "[f]ederal courts are courts of limited jurisdiction." *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 701 (1982).

Hardwire argues that even without its RICO claim, this Court has personal jurisdiction over its other claims against Freyssinet USA under Maryland's conspiracy theory of personal jurisdiction and the "100-mile bulge rule" set forth in Rule 4(k)(1)(B). For the reasons set forth below, the Court finds that Hardwire has failed to meet its burden of establishing this Court's personal jurisdiction over the remaining claims against Freyssinet USA in the FAC. Accordingly, the Court will grant Freyssinet USA's motion to dismiss the remaining claims in the FAC for lack of personal jurisdiction under Rule 12(b)(2).

### 1. Conspiracy Theory of Personal Jurisdiction

A federal court has personal jurisdiction over a non-resident defendant if "(1) an applicable state long-arm statute confers jurisdiction and (2) the assertion of that jurisdiction is consistent with constitutional due process." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016). The Due Process Clause of the Fourteenth Amendment protects a defendant from having to litigate a claim in a forum where he would not "reasonably anticipate" having to litigate. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985). To satisfy due process, a plaintiff must show that a defendant has sufficient minimum contacts with the forum State such that "the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945). The reach of Maryland's long-arm statute is coextensive with

the reach of the Due Process Clause, so the "statutory inquiry merges with [the] constitutional examination." *Id.* However, courts may not "simply dispense with analysis under the [Maryland] long-arm statute," but rather, must interpret it "to the limits permitted by the Due Process Clause when they can do so consistently with the canons of statutory construction." *Mackey v. Compass Mktg., Inc.*, 892 A.2d 479, 493 n. 6 (Md. 2006).

Maryland's long-arm statute provides personal jurisdiction over any person who, among other things, "transacts any business or performs any character of work or service in [Maryland]" or "causes tortious injury in [Maryland] by an act or omission in [Maryland]." MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b). The statute provides jurisdiction over someone who performs such acts directly or through an agent. *Id.* The Maryland Court of Appeals has found that a co-conspirator is an "agent" within the meaning of the statutory text and has accordingly adopted the conspiracy theory of personal jurisdiction. *See Mackey*, 892 A.2d at 495. "The basic premise of the conspiracy theory of personal jurisdiction is that certain acts of one co-conspirator that are done in furtherance of a conspiracy may be considered to be the acts of another co-conspirator for purposes of determining whether a forum state may exercise personal jurisdiction over the other co-conspirator." *Id.* at 484. To establish personal jurisdiction under this theory, a plaintiff must make a threshold showing that:

> (1) two or more individuals conspire to do something
>
> (2) that they could reasonably expect to lead to consequences in a particular forum, [then]
>
> (3) one co-conspirator commits [an] overt act[] in furtherance of the conspiracy, and
>
> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state.

17

*Id.* at 486 (quoting *Cawley v. Bloch*, 544 F. Supp. 133, 135 (D. Md. 1982)).

Hardwire alleges that the Freyssinet Defendants conspired with the IA Defendants to steal Hardwire's trade secrets and other confidential information in order to undercut Hardwire's bid for the K Bridge project. (Opp'n Mot. Dismiss at 28.) Additionally, under the third prong, Hardwire alleges that the Freyssinet Defendants undertook several overt acts in furtherance of the conspiracy, including approaching the IA Defendants in 2013 or early 2014 regarding a collaboration on the K Bridge project, providing Hardwire's proposal to the IA Defendants, and directing the IA Defendants to "cut/paste" information from Hardwire's proposals into the Freyssinet and IA Defendants' bid. (*See id.*) Accordingly, Hardwire has met its burden of presenting a *prima facie* showing that elements one and three of the conspiracy theory of personal jurisdiction are satisfied with respect to this Court's jurisdiction over Freyssinet USA.

To satisfy element two of the conspiracy theory of personal jurisdiction, Hardwire must show that "a reasonable person in the defendant's position would have anticipated a co-conspirator committing an act in furtherance of the conspiracy within the forum jurisdiction." *Gold v. Gold*, Civ. No. JKB-17-0483, 2017 WL 2061480, at *2–3 (D. Md. May 15, 2017) (quoting *Mackey*, 892 A.2d at 486). The standard under the second prong is objective and does not require proof of actual knowledge, rather "the hypothetical 'reasonable person' must form the pertinent expectation *at the time the agreement with the co-conspirator was formed*." *Id.* at *3 (emphasis in original) (quoting *Mackey*, 892 A.2d at 489). Fulfillment of the second prong is necessary to satisfy the constitutional "minimum contacts" requirement articulated by the Supreme Court in *Burger King*. *Mackey*, 892 A.2d at 495; *see also Cleaning Auth., Inc. v. Neubert*, 739 F. Supp. 2d 807, 816 (D. Md. 2010) ("Although all four elements are required, it is this second element that is crucial to making the conspiracy theory of jurisdiction constitutional."). Here, Hardwire makes a *prima facie*

18

showing that a reasonable party would anticipate acts in furtherance of the conspiracy in Maryland because the IA Exclusivity Agreement, which Freyssinet USA allegedly entered at the time when its agreement with the IA Defendants was formed, was expressly "made and performed within the State of Maryland." (*See* Opp'n Mot. Dismiss Exh. A at Art. 14.1, ECF No. 57-2.)

Lastly, under the fourth prong of the conspiracy theory analysis, the Court must determine whether these overt acts were sufficient to extend this Court's personal jurisdiction over Freyssinet USA. Maryland's long-arm statute provides, in relevant part, that a defendant is subject to personal jurisdiction in this state if it "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the state." MD. CODE ANN., CTS. & JUD. PROC. § 6-103(b)(4).

Hardwire fails to meet its burden with respect to the fourth prong. Although Hardwire correctly points out that the IA Defendants—both Maryland citizens—undoubtedly engaged in a persistent course of conduct in the State, Hardwire does not allege any *specific* overt acts that the IA Defendants have taken in furtherance of their conspiracy with Freyssinet USA in Maryland. (*See* Opp'n Mot. Dismiss at 29.) Hardwire also does not explain how the alleged overt acts taken by Freyssinet USA in furtherance of the conspiracy would subject it to this Court's personal jurisdiction under Maryland's long-arm statute. As Freyssinet USA points out in its Reply, the work for the K Bridge project was conducted in New York and the alleged use of Hardwire's confidential information would have occurred in New York or Virginia, Freyssinet USA's place of incorporation and principal place of business. (*See* Reply Mot. Dismiss at 10.) In other words, Hardwire fails to crystallize the connection between Maryland and any concrete overt acts in

19

furtherance of Defendants' alleged conspiracy such that "there is a substantial connection between the forum and a *conspiracy* entered into by such defendants." *Cawley*, 544 F. Supp. at 135 (D. Md. 1982) (emphasis added).

Accepting Hardwire's allegations as the basis for conspiracy theory personal jurisdiction over Freyssinet USA would allow courts to exercise jurisdiction over virtually *any* party alleged to be part of a conspiracy with a citizen of the forum state—a sweeping result which could allow plaintiffs to artfully plead around the "minimum contacts" required under the Fourteenth Amendment. *See Burger King*, 471 U.S. at 471–72; *see also Becker*, 2019 WL 1415483, at *30 ("[T]he conspiracy theory of jurisdiction requires the same sufficient minimum contacts required by due process."). Accordingly, Hardwire fails to make a *prima facie* showing to support this Court's jurisdiction over Freyssinet USA under the conspiracy theory of personal jurisdiction.

### 2. *100-Mile Bulge Rule*

Hardwire further argues that Freyssinet USA is subject to this Court's personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(1)(B)'s "100-mile bulge rule." Rule 4(k)(1)(B) provides that service of a summons establishes personal jurisdiction over "a party joined under Rule 14 or 19 and is served within a judicial district of the United States and not more than 100 miles from where the summons was issued." The rationale behind the bulge rule is that "the benefits that may be obtained from the disposition by a federal court of an entire controversy far outweigh the burden of requiring an appearance in a federal court located in a state other than his own, by an impleaded party properly served within the modest bulge area around the forum." *McGonigle v. Penn-Central Transp. Co.*, 49 F.R.D. 58, 62 (D. Md. 1969).

Although Freyssinet USA was joined as a Defendant under Rule 20(a)(2) (*see* Mot. Leave Am. Compl. at 1, ECF No. 38), Hardwire argues that the bulge rule should nonetheless apply

because Freyssinet USA is a "necessary party." The Court disagrees and declines to disregard the plain language of Rule 4(k)(1)(B). Indeed, all of the cases cited by Hardwire deal with defendants joined under Rule 14 or 19. (*See* Opp'n Mot. Dismiss at 30–31 (citing *Fitzgerald v. Wal-Mart Stores East, LLP*, 296 F.R.D. 392, 394 (D. Md. 2013); *McGonigle*, 49 F.R.D. at 62).)

Even assuming *arguendo* that the Federal Rules contemplated a carve-out for necessary parties that were joined under Rule 20, Hardwire fails to demonstrate that Freyssinet USA is a necessary party to this action. Under Federal Rule of Civil Procedure 19, "[a] party is considered 'necessary' to the action if the court determines either that complete relief cannot be granted with the present parties or the absent party has an interest in the disposition of the current proceedings." *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 847 (11th Cir. 1999) (internal citation omitted). As the Supreme Court has explained, "it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." *Temple v. Synthes Corp., Ltd.*, 498 U.S. 5, 7 (1990). Although Hardwire alleges that the Freyssinet Defendants were "active participants" in a scheme with the IA Defendants to under-bid Hardwire for the K Bridge project, Hardwire does not explain why Freyssinet USA must be present in this suit in order for Hardwire to receive complete relief in its case against the IA Defendants. *See Laker Airways*, 182 F.3d at 847. Accordingly, Hardwire has also not established that this Court has jurisdiction over Freyssinet USA under Rule 4(k)(1)(B), and the Court finds that it lacks personal jurisdiction over the claims against Freyssinet USA in the FAC.

## IV.  *Motion for Leave to File the SAC*

In addition to opposing dismissal, Hardwire cross-moves to file a SAC. (Opp'n Mot. Dismiss at 33–35.) Under Rule 15(a)(2), the Court should "freely give" a party leave to amend its pleadings "when justice so requires." *See Jones v. Ceres Terminal, Inc.*, Civ. No. JKB-14-1889,

2014 WL 5088281, at *2 (D. Md. Oct. 8, 2014) ("Whether to permit the Plaintiff to file an amended complaint is a question that falls within the Court's discretion . . . "). "This directive gives effect to the federal policy in favor of resolving cases on the merits instead of disposing of them on technicalities." *Mayfield v. Nat'l Ass'n for Stock Car Auto. Racing, Inc.*, 674 F.3d 369, 379 (4th Cir. 2012). Consequently, "leave to amend a complaint should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile." *Edell & Assocs., P.C. v. Law Offices of Peter G. Angelos*, 264 F.3d 424, 446 (4th Cir. 2001); *see Foman v. Davis*, 371 U.S. 178, 182 (1962) (concluding leave should be "freely given" absent an apparent reason "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."). The party opposing the amendment of a pleading bears the burden of establishing "prejudice, bad faith, undue delay, or futility." *Chancellor v. Pottsgrove Sch. Dist.*, 501 F. Supp. 2d 695, 700 (E.D. Pa. 2007).

Hardwire argues that the SAC confirms:

(1) The Freyssinet Defendants supplied IA with Hardwire's armor renderings in June 2014, a new and distinct act of misappropriation;

(2) The continued misuse of Hardwire's trade secrets;

(3) Multiple additional projects that Defendants collectively bid and/or worked on using Hardwire's trade secrets;

(4) Hardwire lost profits and market share because of the conspiracy; and

(5) The majority of the actions in furtherance of the Defendants' conspiracy occurred in Maryland.

(Opp'n Mot. Dismiss at 35 (citing SAC ¶¶ 18, 150–55, 212–47, 245, 520–30, ECF No. 57-55).)

Freyssinet USA makes two futility arguments. First, it argues that the SAC is futile because even under the SAC the Court still lacks personal jurisdiction over Freyssinet USA, and consequently, the SAC would not survive a motion to dismiss under Rule 12(b)(2). Second, Freyssinet USA contends that the SAC is futile because it fails to state any plausible claims under Rule 12(b)(6). (*See* Opp'n Mot. Amend, ECF No. 62.) A court may deny leave to amend as futile if the proposed amended complaint would not meet the requirements of the Federal Rules of Civil Procedure. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008); *see Ross v. Cecil Cty. Dep't of Soc. Servs.*, Civ. No. WDQ-11-181, 2012 WL 346625, at *2 (D. Md. Jan. 31, 2012) (analyzing futility under Rule 12(b)). However, in keeping with the federal policy of resolving cases on their merits, courts allow plaintiffs every opportunity to cure defects in the pleadings, even where a court doubts a plaintiff's ability to overcome these defects. *Frazier v. Experian Info. Sols.*, Civ. No. GLR-18-0068, 2018 WL 6726311, at *8 (D. Md. Dec. 21, 2018) (citing *Ostrzenski v. Seigel*, 177 F.3d 245, 252–53 (4th Cir. 1999)). Consequently, "[l]eave to amend ... should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986).

The Court considers Freyssinet USA's challenges to this Court's personal jurisdiction under Rule 12(b)(2) and Hardwire's claims under Rule 12(b)(6) in light of the new allegations set forth in the SAC. For the reasons set forth below, the Court agrees with Freyssinet USA that the SAC is futile because it fails to cure the defects in the FAC as described above. *See supra* Part III. As such, Hardwire's motion to file the SAC will be denied.

### A. *Personal Jurisdiction under RICO*

Freyssinet USA again argues without any analysis that the RICO claim in Hardwire's SAC is not colorable. (*See* Opp'n Mot. Amend at 8.) For the same reasons set forth above, *see supra* Part III.A, the Court finds that Hardwire's RICO claim in the SAC is colorable for purposes of establishing personal jurisdiction over that claim.

### B. *Failure to State a Claim*

Upon finding that Freyssinet USA did not carry its burden of demonstrating that Hardwire's RICO claim in the SAC is not colorable, the Court considers whether Hardwire's SAC would be futile for failure to state a claim under RICO. "The standard for futility [for failure to state a claim] is the same as for a motion to dismiss under Rule 12(b)(6)." *Brightwell v. Hershberger*, Civ. No. DKC-11-3278, 2015 WL 5315757, at *4–5 (D. Md. Sept. 10, 2015). As set forth above, these parallel standards require a complaint—or a proposed amended complaint— to contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *Johnson*, 785 F.2d at 510 ("Leave to amend . . . should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face.").

In the SAC, Hardwire adds new allegations to its previous claims to bolster its argument that the Defendants' racketeering activity began in 2013 and continues "through and including 2019." (*See* SAC ¶ 373.) Specifically, with respect to the K Bridge project, Hardwire alleges that "the IA Defendants, working for the Freyssinet Defendants, manufactured and installed armor on the first span of the K Bridge," and that from mid-2017 to August 2019, "Defendants continued using Hardwire's Trade Secrets, including Armor Recipes and Armor Renderings" during the construction of the second span of the K Bridge. (*Id.* ¶¶ 212, 223.) Additionally, Hardwire alleges

that the IA Defendants and Freyssinet Defendants have disclosed Hardwire's confidential and proprietary information in connection with bids for four other projects from September 2016 to mid-2018. (*Id.* ¶¶ 245, 381–84.)

For the same reasons articulated above, *see supra* Part III.B, the Court finds that Hardwire alleges only the continuing use and misappropriation of its trade secrets, which do not constitute independent violations of the criminal trade secrets statute for the purposes of pleading RICO predicate acts. Accordingly, Hardwire again fails to plead any post-enactment predicate acts of racketeering activity, and Hardwire's RICO claim in the SAC is futile for failure to state a claim under Rule 12(b)(6).

### C. Personal Jurisdiction as to the Other Claims in the SAC[5]

Freyssinet USA also challenges the SAC for lack of personal jurisdiction. (Opp'n Mot. Amend at 8–12.) Upon finding that Hardwire's RICO claim in the SAC would not survive dismissal, the Court considers whether the amended allegations set forth in the SAC provide an independent basis for this Court's jurisdiction over Freyssinet USA with respect to the remaining claims in the SAC. Hardwire again argues that personal jurisdiction under Maryland's conspiracy theory of personal jurisdiction and the "100-mile bulge rule" under Rule 4(k)(1)(B). The Court finds that Hardwire does not meet its burden of establishing personal jurisdiction under either of these theories, and accordingly, will deny Hardwire's motion to file the SAC for futility under the Federal Rules.

---

[5] This Court and others have previously declined to deny leave to amend on futility grounds for lack of personal jurisdiction when a proposed amended complaint seeks to add a new party. *See, e.g.*, *Pridgen v. Appen Butler Hill, Inc.*, Civ. No. JKB-18-0061, 2019 WL 1048950, at *3–4 (D. Md. Mar. 5, 2019); *Speedsportz, LLC v. Menzel Motor Sports*, Civ. No. 07-624, 2008 WL 4632726, at *2 (N.D. Okla. Oct. 17, 2008) (concluding that adding a defendant would not be wholly futile and waiting to "decide the question of personal jurisdiction based on a fully briefed motion to dismiss"). Here, however, Freyssinet USA was previously named as a defendant in the FAC, and as set forth above, Freyssinet USA's motion to dismiss the FAC, *inter alia*, for lack of personal jurisdiction is fully briefed. Accordingly, the Court will consider Freyssinet USA's jurisdictional futility arguments now in the interest of judicial economy.

### 1. *Conspiracy Theory of Personal Jurisdiction*

As set forth more fully above, *see supra* Part III.C.1, in order to establish that a defendant is subject to the conspiracy theory of personal jurisdiction in Maryland, a plaintiff must make a threshold showing that

> (1) two or more individuals conspire to do something
>
> (2) that they could reasonably expect to lead to consequences in a particular forum, [then]
>
> (3) one co-conspirator commits [an] overt act[] in furtherance of the conspiracy, and
>
> (4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state.

*Mackey*, 892 A.2d at 486 (quoting *Cawley*, 544 F. Supp. at 135).

In its Reply, Hardwire argues that the conspiracy theory of personal jurisdiction applies because "[t]he SAC details a multiyear conspiracy wherein Freyssinet Defendants misappropriated Hardwire's Trade Secrets and provided them to IA Defendants, in Maryland, while instructing the IA Defendants to utilize the Trade Secrets to replicate Hardwire's proprietary formulas in an effort to undercut Hardwire." (Reply Mot. Amend at 18–19 (citing SAC ¶¶ 154–56, 247), ECF No. 66.) Further, Hardwire alleges that "[a]t all times, Freyssinet USA was aware that Hardwire, and the IA Defendants, were located in Maryland, and actively furthered the conspiracy by inducing Hardwire (a Maryland company) to disclose Trade Secrets." (*Id.* at 19 (citing SAC ¶¶ 9, 18).) The Court again finds that Hardwire fails to allege an overt act "of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state." *Mackey*, 892 A.2d at 486 (internal citation and quotation marks omitted). As such, Hardwire does not meet its burden of establishing a *prima facie* showing of personal

jurisdiction under the conspiracy theory for the same reasons set forth above. *See supra* Part III.C.1.

### 2. *100-Mile Bulge Rule*

In its Reply, Hardwire reiterates the arguments from its response to Freyssinet USA's motion to dismiss the FAC with respect to the "100-mile bulge rule," as explained in more detail above. *See supra* Part III.C.2. The Court again finds these contentions unavailing. Accordingly, Hardwire has not met its burden of establishing personal jurisdiction over its remaining claims against Freyssinet USA in the SAC through the "100-mile bulge rule."

### V. *Conclusion*

For the foregoing reasons, an Order shall enter granting Freyssinet USA's motion to dismiss (ECF Nos. 50, 51) Hardwire's claims against it in the FAC pursuant to Rule 12(b)(2), denying Hardwire's motion to file the SAC (ECF No. 57), and dismissing Freyssinet USA as a defendant in this case.

DATED this ___25___ day of August, 2021.

BY THE COURT:

James K. Bredar
Chief Judge